[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16860
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00091-CR-ORL-22-KRS

UNITED STATES OF AMERICA,

                                                              Plaintiff-Appellee,

versus

DAVID ALLEN TAGG,

                                                              Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 30, 2009)

Before HULL, PRYOR and FAY, Circuit Judges.

FAY, Circuit Judge:

David Allen Tagg appeals his conviction for aiding and abetting the unlawful possession of firearms, specifically, unregistered pipe bombs. On appeal, he argues that the evidence was insufficient to support his conviction and that the possession of the pipe bombs was protected by the Second Amendment of the United States Constitution. For the reasons set forth below, we affirm Tagg's conviction.

## I.

A federal grand jury returned a single-count indictment against Tagg, Brandon Woll, and Michael Morgan, charging them with aiding and abetting one another in the unlawful possession of a firearm, specifically, an unregistered destructive device, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, and 18 U.S.C. § 2. Woll and Morgan pled guilty pursuant to written plea agreements, and Tagg proceeded to trial.

At trial, the government called Kelly Boaz, a bomb technician with the Orange County Sheriff's Office. He testified, inter alia, that on July 2, 2007, he was called to investigate an explosive device that detonated inside a trash receptacle in downtown Walt Disney World. Boaz determined that the explosive device had been a pipe bomb, as there were pieces of galvanized pipe found in and around the trash receptacle. The investigation "went cold" until September 2007,

at which time Boaz received an anonymous tip, informing him that Woll, Morgan, and a woman named Sarah Folsom were responsible for the pipe bomb. Boaz subsequently interviewed Tagg, whose name had come up during the investigation, and Tagg informed him that, although he had driven Woll and Morgan to the Bass Pro Shop, where he had purchased cashew nuts, he did not recall purchasing gunpowder there. Morgan informed Boaz during the investigation that the devices had been manufactured in Tagg's garage, and, upon searching Tagg's garage with his consent, Boaz found a drill, a vice grip, and PVC pipe that Morgan indicated were used to manufacture the pipe bombs.

The government called Morgan, who testified that he and Woll built three pipe bombs on July 1, 2007, using galvanized steel pipe, gunpowder, a vice grip, and a drill. Because Woll and Morgan were only 20 years old – and they believed that they had to be 21 to purchase gunpowder – they asked Tagg to buy it for them so that they could make pipe bombs. Tagg reluctantly agreed, drove them to the Bass Pro Shop, and purchased gunpowder and cashews. Morgan and Woll made the pipe bombs in Tagg's garage, during which time Tagg sat in his chair seven or eight feet away, read the newspaper, and looked over at them occasionally. After Morgan and Woll finished constructing the pipe bombs and showed one to Tagg, Morgan expressed an interest in lighting one right there, but Tagg said, "No. Go

3

off somewhere else." As a result, Morgan and Woll left Tagg's house and lit two of the pipe bombs, only the first of which exploded. They then went to see a movie at Disney World, after which time, at around midnight, Morgan, Woll, and Folsom detonated the third pipe bomb in the trash receptacle at Disney World.

The government called Agent Lori McLaughlin of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the lead investigator in the case. She testified, inter alia, that she went to the Bass Pro Shop, where the store manager provided a receipt indicating that, on July 1, 2007, someone purchased cashew nuts and gunpowder. Although the customer paid in cash, the manager was able to retrieve the telephone number provided by the customer, which McLaughlin later discovered to be Tagg's home phone number.[1] McLaughlin, like Boaz, later discovered in Tagg's basement the drill and vice grip that Morgan indicated he used to make the pipe bombs.

After the government rested, the defense called Tagg and Woll, who were stepfather and stepson. They both testified that, although Tagg drove Woll and Morgan to the Bass Pro Shop, Tagg did not purchase the gunpowder, did not know that Woll and Morgan planned to build pipe bombs, and did not see them build the pipe bombs in his garage.

---

[1] The government later called Jeff Lyons, the loss prevention manager of the Bass Pro Shop, who corroborated McLaughlin's testimony about the transaction, receipt, and phone number.

The jury ultimately returned a guilty verdict against Tagg on the sole count of the indictment. At no time did the defense move for a judgment of acquittal. The court subsequently sentenced Tagg to two years' imprisonment.

**II.**

"We review the sufficiency of the evidence <u>de novo</u>, viewing the evidence in the light most favorable to the government and accepting all reasonable inferences in favor of the verdict." <u>United States v. Mendez</u>, 528 F.3d 811, 814 (11th Cir.) (emphasis added), <u>cert. denied</u>, 129 S.Ct. 292 (2008). As the government points out, our standard of review is even more deferential here because Tagg did not move for a judgment of acquittal in the district court. As a result, "we may reverse the conviction only to prevent a manifest miscarriage of justice. This standard requires the appellate court to find that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." <u>United States v. Bender</u>, 290 F.3d 1279, 1284 (11th Cir. 2002) (citation omitted). As discussed below, Tagg cannot show that upholding his conviction would result in a miscarriage of justice because, even applying our traditional sufficiency standard of review, he would not be entitled to relief.

The National Firearms Act ("NFA") makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms

5

Registration and Transfer Record[.]" 26 U.S.C. § 5861(d); see id. § 5841(a) (establishing the central registry). The statute defines the term "firearm" as, inter alia, a "destructive device," id. § 5845(a)(8), which, in turn, is defined as, inter alia, "any explosive . . . bomb," id. § 5845(f)(1)(A). "Although § 5861(d) contains no express mens rea requirement, the Supreme Court has held that the government must prove beyond a reasonable doubt that the defendant knew that the weapon he possessed had the characteristics that brought it within the statutory definition of a firearm." United States v. Miller, 255 F.3d 1282, 1286 (11th Cir. 2001) (citing Staples v. United States, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). In other words, the government must prove that the defendant was aware of the features subjecting the firearm to registration; however, the government does not have to prove that the defendant knew "what features define a 'firearm' under 26 U.S.C. § 5845(a)." United States v. Ruiz, 253 F.3d 634, 638 & n.4 (11th Cir. 2001). Nor is the government required to prove "that the defendant knew that his possession was unlawful, or that the firearm was unregistered." Miller, 255 F.3d at 1286 n.3 (citing United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971)).

In this case, it is undisputed that Tagg was not convicted of actually possessing an unregistered firearm, but was rather convicted of aiding and abetting

such unlawful possession by Woll and Morgan. See 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). "To prove guilt under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000).

The first element above is not at issue in this case, as both Woll and Morgan, who actually possessed the pipe bombs, pled guilty to violations of § 5861(d).[2] Instead, Tagg's primary argument on appeal is that he was a "mere spectator" and, thus, did not intentionally facilitate Woll and Morgan's possession of the pipe bombs. However, there was substantial evidence introduced at trial that could have

---

[2] In this respect, we note that Tagg does not dispute that the pipe bombs qualified as "firearms" under § 5845(a)(8) and (f)(1). It is true that Tagg cites our decision in United States v. Hammond, 371 F.3d 776 (11th Cir. 2004), which held that, in order for an explosive device to so qualify, the government must prove that it was "designed as a weapon." Id. at 780 ("Thus, a device that explodes is not covered by the statute merely because it explodes. Statutory coverage depends upon proof that a device is an explosive plus proof that it was designed as a weapon."); see 26 U.S.C. § 5845(f) (excluding from coverage any destructive device that was neither "designed nor redesigned for use as a weapon"). However, Tagg cites Hammond only to support his distinct mens rea argument – addressed below – that he was unaware of the features subjecting the pipe bombs to registration. Thus, Tagg has abandoned any contention that the pipe bombs did not constitute "firearms" under the statute. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (stating that arguments not raised on appeal are abandoned).

allowed a reasonable jury to reach a contrary conclusion. Most significantly, Morgan testified that Tagg drove Woll and Morgan to the Bass Pro Shop, purchased gunpowder for them with the understanding that they planned to use it to build pipe bombs, observed Woll and Morgan build the pipe bombs in his garage with his tools, saw the finished product, and told them to go light the pipe bombs somewhere else. Morgan's testimony was corroborated in part by Officer Boaz and Agent McLaughlin, who discovered in Tagg's garage the tools that Woll and Morgan used to build the pipe bombs. McLaughlin also testified that, in investigating the gunpowder transaction, she discovered that the purchaser provided the Bass Pro Shop with Tagg's home telephone number.

The defense introduced conflicting testimony through both Tagg and Woll, namely, that Tagg did not purchase the gunpowder and was unaware that Woll and Morgan planned to, and, in fact, did, build pipe bombs in his garage. However, the jury clearly did not believe their testimony, and Tagg offers no reason on appeal why we should disturb the jury's credibility determination.[3] See United States v. Siegelman, 561 F.3d 1215, 1219 (11th Cir. 2009) (explaining that we defer to the jury's credibility determinations); United States v. Pearson, 746 F.2d 787, 794 (11th Cir. 1984) ("Although there was substantial conflicting defense testimony,

_____

[3] Indeed, a review of both Tagg and Woll's testimony reveals several material inconsistencies.

8

all conflicts in the evidence must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."). Thus, in light of the testimony given by Morgan, Officer Boaz, and Agent McLaughlin, there was sufficient evidence for a reasonable jury to conclude that Tagg intentionally facilitated Woll and Morgan's unlawful possession of the pipe bombs. See Camacho, 233 F.3d at 1317.

Finally, and as noted above, Tagg contends that he was unaware of the features subjecting Woll and Morgan's "firearm" to registration and, therefore, lacked the requisite mens rea. This contention is without merit because substantial circumstantial evidence introduced at trial established that Tagg knew that Woll and Morgan made pipe bombs. See Staples, 511 U.S. at 615 n.11, 114 S.Ct. at 1802 n.11 ("[K]nowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon."). Indeed, not only did Morgan testify that he and Woll explicitly told Tagg that they intended to build pipe bombs, but Morgan also testified that he showed Tagg the pipe bombs in their final form. See Miller, 255 F.3d at 1287 (concluding that the government sufficiently proved the defendant's knowledge where the feature at issue – the length of a shotgun barrel – was "a patently obvious characteristic, readily apparent to anyone . . . who observes the gun"); United States v. Moore,

9

253 F.3d 607, 611 (11th Cir. 2001) ("[T]he jury could have inferred the requisite knowledge from the condition of the object.").

In sum, we conclude that there was sufficient evidence for a reasonable jury to find Tagg guilty of aiding and abetting the possession of an unregistered firearm. For this reason, Tagg has not shown that upholding his conviction would result in a miscarriage of justice. See Bender, 290 F.3d at 1284.

### III.

"We review constitutional claims de novo." United States v. Anton, 546 F.3d 1355, 1357 (11th Cir. 2008), cert. denied, (U.S. Apr. 20, 2009) (No. 08-1183). Relying on the Supreme Court's recent, landmark decision in District of Columbia v. Heller, 554 U.S. __, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), Tagg argues that his conviction violated his right to keep and bears arms under the Second Amendment.[4] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; see also Heller, 554 U.S. at __, 128 S.Ct. at 2789 ("The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the

---

[4] For the sake of preservation, Tagg also raises several other constitutional issues on appeal, but he concedes that they are foreclosed by case law. After an independent review, we agree with Tagg's assessment and therefore accept his concession.

10

latter grammatically, but rather announces a purpose. The Amendment could be rephrased, 'Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.'").

Before Heller, the scope of the Second Amendment was largely defined by the Supreme Court's decision in United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In that case, the Court upheld against a Second Amendment challenge two defendants' convictions under the NFA for possession of an unregistered short-barreled shotgun. Id. at 175, 59 S.Ct. at 816. In a much-quoted passage, the Court reasoned:

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

Id. at 178, 59 S.Ct. at 818.

In striking down the District of Columbia's ban on the possession of usable handguns, the Supreme Court in Heller concluded, for the first time, that the Second Amendment guarantees an individual right to possess weapons unconnected with militia service. See 554 U.S. at __, 128 S.Ct. at 2787-2812; see also id. at __, 128 S.Ct. at 2797 (stating that the Second Amendment "guarantee[s]

11

the individual right to possess and carry weapons in case of confrontation"). The Court explained that this individual right comported with the purpose of the Amendment – to prevent the elimination of the militia – because "the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms . . . ." Id. at __, 128 S.Ct. at 2801.

The Court emphasized, however, that "the right secured by the Second Amendment is not unlimited," and one "important limitation" came from the Court's previous opinion in Miller. Id. at __, 128 S.Ct. at 2816-17. Specifically, the Heller Court explained that Miller stood only for the proposition that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Id. at __, 128 S.Ct. at 2815-16. The Court found that limiting the type of weapons protected to those that were "in common use at the time" was "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." Id. at __, 128 S.Ct. at 2817 (quotations omitted). The Court further explained that this limitation reinforced its earlier conclusion about the way in which the Second Amendment's operative clause furthered the Amendment's purpose. See id. at __, 128 S.Ct. at 2815-16.

12

Applying Heller to the facts of this case, we conclude that the pipe bombs at issue were not protected by the Second Amendment. Unlike the handguns in Heller, pipe bombs are not typically possessed by law-abiding citizens for lawful purposes. See United States v. Dempsey, 957 F.2d 831, 834 (11th Cir. 1992) (adopting the Ninth Circuit's reasoning that, "unlike firearms which may be used for sports, recreation or for collection, pipe bombs have no legitimate purpose") (citing United States v. Loveday, 922 F.2d 1411, 1416 (9th Cir. 1991));[5] see also United States v. Fincher, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (holding that, after Heller, the defendant's possession of a machine gun and an unregistered sawed-off shotgun was not protected by the Second Amendment because those weapons were "not in common use by law-abiding citizens for lawful purposes and therefore [fell] within the category of dangerous and unusual weapons that the government can prohibit for individual use"), cert. denied, 129 S.Ct. 1369 (2009); cf. Heller, 554 U.S. at __, 128 S.Ct. at 2817-18, 2821-22 (striking down the

---

[5] Accord United States v. Jennings, 195 F.3d 795, 798 (5th Cir. 1999) ("[I]t would be quite difficult to protect oneself or one's family with a pipe bomb. In fact, we cannot conceive of any non-violent or lawful uses for a pipe bomb.") (footnote omitted); United States v. Drapeau, 188 F.3d 987, 990 n.4 (8th Cir. 1999) ("The offense of unlawfully making a bomb, however, focuses on the inherent dangerousness of, and lack of a legitimate purpose for, the bomb itself."); United States v. Dodge, 846 F.Supp. 181, 184 (D. Conn. 1994) ("Pipe bomb[s] are inherently dangerous weapons for which no peaceful purpose can be seriously suggested . . . ."); Matthew Heimann, Comment, The Expansion of Leocal: The Mere Possession of a Pipe Bomb Constitutes a Crime of Violence, 3 SETON HALL CIRCUIT REV. 617, 639 (2007) ("[T]he possession of a pipe bomb is an act that has no legitimate or nonviolent purpose.").

13

handgun ban because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for the lawful purpose of self-defense in the home, which "has been central to the Second Amendment right"). Thus, under <u>Heller</u>, Tagg's conviction did not violate the Second Amendment.

## IV.

For the reasons set forth above, we affirm Tagg's conviction.

**AFFIRMED.**