[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13352

_____

D.C. Docket No. 1:11-cr-00027-WLS-TQL-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TREVAYNE D. JONES,
DONTREAL M. JENKINS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(April 15, 2015)

Before MARCUS, JILL PRYOR and EBEL,[*] Circuit Judges.

PER CURIAM:

---

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Trevayne Jones and Dontreal Jenkins appeal their convictions for various offenses related to their involvement in a scheme to cash stolen federal income tax refund checks.  A jury found Jones and Jenkins guilty of three offenses: conspiracy to embezzle public monies; embezzlement of government property; and aggravated identity theft.  The jury also convicted Jones of making misleading statements; and it convicted Jenkins of mail and wire fraud conspiracy, for his participation in an unrelated scheme to fraudulently obtain student loans.  Jones and Jenkins appeal each conviction, arguing that there was insufficient evidence presented at trial to support the jury's verdicts and that the district court improperly denied their motions for judgment of acquittal.  After thorough review, we are satisfied that a reasonable jury could, as it did, find the defendants Jones and Jenkins guilty beyond a reasonable doubt and, therefore, we affirm.

I.

A.

The essential facts are straightforward.  Jones and Jenkins were arrested in May 2011 after it came to the attention of state and federal authorities that they had been cashing stolen federal income tax refund checks at a convenience store in Albany, Georgia since January.  Over this five month period, Jones and Jenkins cashed 342 stolen checks with a cumulative value of $713,000.  On May 11, 2012, a grand jury returned a ten-count superseding indictment charging Jones, Jenkins,

2

Jamal Williams, and another defendant, Kevinall Wheeler, with multiple offenses. Jones was charged with (1) conspiracy to embezzle public monies, in violation of 18 U.S.C. §§ 641 and 371 (Count One); (2) embezzlement of government property, in violation of 18 U.S.C. § 641 (Count Two); (3) aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Three); (4) making misleading statements, in violation of 18 U.S.C. § 1512(b)(3) (Count Nine); and (5) mail and wire fraud conspiracy, in violation of 18 U.S.C. §§ 1341, 1343, and 1349 (Count Ten). Jenkins was charged with (1) conspiracy to embezzle public monies, in violation of 18 U.S.C. §§ 641 and  371 (Count One); (2) embezzlement of government property, in violation of 18 U.S.C. § 641 (Count Four); (3) aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Five); and (4) mail and wire fraud conspiracy, in violation of 18 U.S.C. §§ 1341, 1343, and 1349 (Count Ten). Although Jones and Jenkins cashed over 300 checks, the indictment charged each of them with a single act of identity theft.  Specifically, Jones was charged with possession and conversion of a check belonging to Anthony Pourhassan, as well as with possessing and using Pourhassan's name and signature; and Jenkins was charged with possession and conversion of a check belonging to Arnulfo Vasquez Castillo, as well as with possessing and using Castillo's name and signature. Count Ten, which charged the defendants with mail and wire fraud conspiracy, alleged that they had entered into a single agreement -- unrelated to the check

cashing scheme -- with an individual named Princess Eatmon to fraudulently obtain student loans from the Department of Education.

Jones and Jenkins's codefendants, Williams and Wheeler, both pled guilty. Jones and Jenkins were tried before a jury in January 2013. Because the defendants challenge the sufficiency of the evidence, we recount the proofs adduced at trial in some detail. Among others, the United States elicited testimony from several witnesses, who explained how Jones and Jenkins procured and cashed over 300 stolen income tax refund checks. The most detailed information came from Nainesh Patel, the owner of the convenience store where the defendants cashed the checks, and from Jamal Williams, a cooperating codefendant. Patel testified that he and his wife have owned and operated a BP gas station and convenience store in Albany since 2004. He has known defendants Jenkins ("Tre") and Jones ("Dre") for five or six years, because they often spent several hours per day in his store playing various Georgia Lottery games.

The convenience store also provides check cashing services. Jones first approached Patel with a United States Department of the Treasury check in early 2011. Jones claimed that his sister had a tax business, and that he would be bringing in income tax refund checks belonging to her customers for Patel to cash. Although Patel never took steps to contact Jones's sister or to confirm the tax business's existence, he did verify the authenticity and amount of each check using

4

the Treasury Department's website.[1]  Patel also filed a copy of Jones's driver's license with a copy of each Treasury check for his records, and he marked each check "Dre" to indicate that it had been brought in by Jones.  After a short time, Jones told Patel that Jenkins also would be bringing in checks to be cashed as part of the same business.  When filing copies of checks that Jenkins brought into the store, Patel marked these checks "Tre."

Patel estimated that Jones and Jenkins brought approximately 300 Treasury checks into his store.  Copies of the checks were admitted into evidence, and the jury had the opportunity to see that Patel had marked the checks "Dre" and "Tre" respectively.  Four victims whose checks were cashed by the defendants at the Patels' BP gas station also testified that they had not given anyone else the authority to cash their refund checks and that the signatures appearing on their checks were forged.

Surveillance tapes from the store corroborated Patel's testimony.  The footage showed Patel handing checks to Jenkins -- allegedly while trying to verify them on the internet -- and then later handing him between $20,000 and $30,000 in cash.  Additional footage showed Patel holding a Treasury check and then handing cash to Jones.

---

[1] Patel testified that he used a website operated by the United States Department of the Treasury to verify that each check brought in by the defendants had actually been issued by the Treasury Department.  Patel explained that, by entering the check number and routing number of each check onto the webpage, he could confirm that the checks were authentic income tax refund checks and verify their amounts.  Photographs of the website were admitted into evidence.

The defendants' co-conspirator, Jamal Williams, provided additional information about the operation.  Williams agreed to plead guilty to two counts -- embezzlement of government property and aggravated identity theft -- and the government dismissed all remaining charges in exchange for testimony against Jones and Jenkins.  On four different occasions, Williams transported stolen Treasury checks from Atlanta to Albany so that they could be cashed at the Patels' store, after learning from a mutual acquaintance that Jenkins was able to cash stolen checks there.  Williams procured several checks from Deborah Echols, an employee at the United States Postal Service in Atlanta, and arranged a meeting with Jenkins.  At their initial meeting, Williams gave Jenkins two or three checks to ascertain whether the process was reliable.  Jenkins cashed the checks at the BP and, after taking a cut of the total, delivered about $5,000 to Williams.

Williams made three more trips to Albany over the course of the next several weeks.  After the first visit was successful, Williams requested more checks from Echols.  By the third visit, he was transporting checks with a cumulative value of $80,000 to Albany for Jenkins to cash.  During the third visit, Williams met Jones for the first time.  Jones met with Williams and Jenkins to pick up half of the checks, because Patel set a limit on the amount that a single individual could obtain using his service.  When the checks were cashed Jenkins would take forty percent of the money, and Williams would convey the remainder back to Echols in Atlanta.

6

Williams also explained that, to his knowledge, Echols and Jenkins would sign the checks.

On May 12, 2011 Williams was en route to his fifth meeting with Jenkins when he was stopped for speeding in Cordele, Georgia.  Because Williams had been smoking marijuana when he was stopped, the police searched his vehicle. The search revealed twelve stolen Treasury checks.  Ten of the twelve checks were unsigned.  When law enforcement later searched Williams's cell phone, they discovered that he had sent identifying information from two of the checks to Jenkins by text message.  Other text messages between Williams and Jenkins set the meeting place and time for Williams's fifth trip to Albany and confirmed that Jenkins wanted Williams to "do . . . big numbers" -- or bring checks worth a large amount.

The government also presented evidence at trial that Jones made false statements to law enforcement agents when interviewed about his involvement in the check cashing operation.  Anita Allen, a lieutenant in the Dougherty County Sheriff's Office, testified that she interviewed Jones in May 2011.  A videotape of the interview was played for the jury.  Lieutenant Allen asked Jones if he had cashed checks at the Patels' BP.  Jones replied that he had only cashed his "own checks" at the store -- meaning checks for his various lottery winnings.  Notably, he denied cashing Treasury checks or vouching for any individuals seeking to cash

7

Treasury checks.  He also denied that any surveillance video from the store would contain footage of him cashing checks.

Finally, the United States presented evidence that Jenkins participated in a separate fraudulent scheme orchestrated by Princess Eatmon, who testified at the trial.  For her role organizing the operation, Eatmon pled guilty to wire and mail fraud, aggravated identity theft, and embezzlement of government property.  Eatmon explained that she devised and operated a fraudulent student loan scheme, which she maintained from 2009 until her incarceration.  She collected individuals' personal information, filled out Free Application for Federal Student Aid ("FAFSA") forms for them, and enrolled them in online classes at two different schools: Rio Salado College and American Public University.

Once an individual was registered for classes, Eatmon would turn in the required assignments while the federal government processed the FAFSA.  The enrolled student did not complete any coursework.  It usually took about six weeks for the government to approve the loan applications and for the schools to subtract their fees and distribute the funds to Eatmon.  Eatmon would then withdraw the money, deduct her fee, and send the rest to the person whose information was used to secure the loan.  After Eatmon withdrew the loan money, she stopped submitting assignments, and, as a result, the student would receive failing grades for all of the classes.

8

Eatmon enrolled Jenkins in classes at both Rio Salado College and American Public University at his request.[2] Jenkins gave his identifying information to Eatmon so that she could fraudulently obtain student loans for him, and Eatmon transferred approximately $2,200 to Jenkins after the loan was disbursed to her account. Officials from Rio Salado College and American Public University corroborated Eatmon's testimony. Ryan Chase testified that Jenkins enrolled in classes at Rio Salado College for one semester. He testified that the College distributed a $3,000 loan to Jenkins on the basis of this enrollment. He also confirmed that Jenkins received failing grades in the classes. Similarly, Keith Wellings testified that Jenkins enrolled in four classes at American Public University, each of which he failed. He further stated that the University sent two checks to Jenkins, one for $1,724 and one for $1,350.

B.

On January 11, 2013, the jury found Jones guilty of conspiracy to embezzle public monies, embezzlement of government property, aggravated identity theft, and making misleading statements. It found him not guilty of mail and wire fraud conspiracy. The jury convicted Jenkins on all indicted counts. Both defendants renewed their Rule 29 motions.

---

[2] Eatmon also testified about Jones's involvement in the scheme. However, the jury found Jones not guilty on this count.

On June 26, 2013, the district court denied the defendants' motions for a judgment of acquittal in a written order.  The district court then sentenced Jones to 60 months imprisonment on Count One, 109 months on Count Two, and 109 months on Count Nine to be served concurrently, 24 months on Count Three to be served consecutively, for a total term of 133 months, and three years of supervised release.  The court sentenced Jenkins to 60 months imprisonment on Count One, 109 months on Count Four, and 109 months on Count Ten to be served concurrently, 24 months on Count Five to be served consecutively, for a total term of 133 months, and three years of supervised release.  The court also ordered both defendants to pay restitution to Patel in the amount of $713,000.  The defendants timely appealed.

## II.

## A.

We review the "sufficiency of [the] evidence to support a conviction de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences . . . in favor of the jury's verdict." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007).  "It is not necessary for the government to disprove every reasonable hypothesis of innocence, as the jury is free to choose among reasonable constructions of the evidence." United States v. Mieres-Borges, 919 F.2d 652, 656 (11th Cir. 1990) (internal quotation marks

omitted).  Moreover, "[t]o the extent that [the defendants'] argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question."  United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999); see Taylor, 480 F.3d at 1026 (explaining that the Court must accept the reasonable credibility determinations that support the jury's verdict).

When a defendant raises a claim challenging the sufficiency of the evidence for the first time on appeal, this Court reviews for plain error.  United States v. Hunerlach, 197 F.3d 1059, 1068 (11th Cir. 1999).  Under the plain error standard, this Court will "reverse [a] conviction only to prevent a manifest miscarriage of justice."  United States v. Tagg, 572 F.3d 1320, 1323 (11th Cir. 2009) (internal quotation marks omitted).  A conviction constitutes a manifest miscarriage of justice if "evidence on a key element of the offense is so tenuous that a conviction would be shocking."  Id.

### B.

First, Jones and Jenkins argue that there is insufficient evidence from which a reasonable jury could find them guilty of conspiracy to embezzle public monies, because Williams's testimony only established their connection to around forty stolen checks.  Thus, they claim that the government did not present sufficient evidence that they cashed each of the 342 checks charged in the indictment.  The

11

defendants also argue that the government failed to prove that they agreed to enter into an overarching agreement with persons in Atlanta to steal and cash stolen checks. They assert that the proof offered at trial showed, if anything, that multiple conspiracies existed to steal checks from an Atlanta Post Office, and that these conspiracies formed a "rimless wheel" or "hub-and-spoke" conspiracy -- with each separate conspiracy having a connection only to the central operator and not to the other conspiracies. These arguments are unconvincing.

Section 641 of Title 18 of the United States Code criminalizes "embezzl[ing], steal[ing], purloin[ing], or knowingly convert[ing] to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof." To sustain a conviction for conspiracy to embezzle public monies, the government must prove beyond a reasonable doubt: (1) "the existence of an agreement to achieve an unlawful objective"; (2) "the defendant's knowing and voluntary participation in the conspiracy"; and (3) "an overt act in furtherance of the conspiracy." United States v. US Infrastructure, Inc., 576 F.3d 1195, 1203 (11th Cir. 2009). "'Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances.'" United States v. Reeves, 742 F.3d 487, 497 (11th Cir. 2014) (quoting Glasser v.

12

United States, 315 U.S. 60, 80 (1942), superseded on other grounds by Fed. R. Evid. 104(a) (alteration omitted).

First, Jones and Jenkins argue that the government did not prove that they cashed 342 checks; we disagree.  The trial record contained sufficient evidence for a reasonable jury to find the defendants guilty beyond a reasonable doubt of conspiracy to embezzle public monies.  Patel testified that Jones and Jenkins cashed over 300 Treasury checks at his store, and that he kept detailed records of which checks were brought in by each of them.  Patel also explained the contents of surveillance footage that the jury could reasonably believe corroborated his account.  The jury was entitled to credit Patel's account of the number of checks he received from Jones and Jenkins and to infer from this testimony that the defendants had a supplemental source for stolen checks.  It need not have concluded from Williams's testimony that he was their exclusive supplier.

Moreover, Jones and Jenkins's arguments about their limited knowledge of a "rimless wheel" conspiracy to steal checks from the post office in Atlanta are misplaced.  We have overturned conspiracy convictions on the basis of "hub-and-spoke" or "rimless wheel" arguments only under a narrow set of circumstances.  In these cases, a scheme is directed by a "key man" who "construct[s] a vast network of co-conspirators" -- each of whom interact only with that central operator. United States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004).  "In such a

13

conspiracy, the core conspirators are the hub and each group of co-conspirators form[s] a spoke leading out from the center in different directions." Id. at 807. This type of situation is also referred to "as a 'rimless wheel' because there is no rim to connect the spokes into a single scheme." Id. (citing Kotteakos v. United States, 328 U.S. 750, 755 (1946)). Under these circumstances, we require the government to distinguish between the common plan of the central hub and "the several, though similar, purposes of . . . like character" that are attributable to each spoke. See id.; see also United States v. Perez, 489 F.2d 51, 59 n.11 (5th Cir. 1973) (emphasizing "[t]he importance in a wheel type conspiracy of . . . knowledge by individual spokes of the existence of other spokes").[3] In other words, a defendant who agreed only to a plan confined to a single spoke cannot be convicted of agreeing to the hub's scheme for the entire network.

Here, the defendants were charged with conspiring with each other to appropriate and cash 342 stolen United States Treasury checks, and Patel's testimony established that Jones and Jenkins agreed to jointly bring these checks into his store to be cashed. In other words, the charged conspiracy included only conduct that Jones and Jenkins personally engaged in --not actions perpetrated by conspiracies connected only to Jones and Jenkins by a mutual director. It is irrelevant that they may not have known who else received stolen checks from

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

14

Deborah Echols, Williams, or others connected to the Atlanta Post Office, because Jones and Jenkins were not charged with agreeing to any other plan that Echols and others may have had.  Their unlawful agreement to fraudulently cash refund checks and the overt actions they took to further it are sufficient to meet each of the elements of a conspiracy.  Cf. United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007) ("It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators." (alterations and internal quotation marks omitted)).

## C.

Second, Jones and Jenkins contest the sufficiency of the evidence to support their convictions for embezzlement of government property, arguing that the evidence at trial could support the inference that Patel was the operator of the check cashing scheme.  Because the defendants challenge their convictions on this basis for the first time on appeal, this Court reviews the jury's verdict for plain error, Hunerlach, 197 F.3d at 1068, and may only reverse if necessary to avoid a "manifest miscarriage of justice," Tagg, 572 F.3d at 1323.  Under plain error review, the defendants bear the burden of showing that there is "(1) error, (2) that is plain and (3) that affects substantial rights.  If all three conditions are met, an

15

appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007) (internal quotation marks omitted).

To sustain a conviction for embezzlement of government property the United States must establish three elements:

> (1) that the money or property belonged to the government; (2) that the defendant fraudulently appropriated the money or property to his own use or the use of others; (3) and that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property.

United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993).

Here, the record contains more than enough evidence to support Jones and Jenkins's convictions, and we can discern no error, plain or otherwise, in the jury's verdict.  It is undisputed that all of the checks were United States Treasury checks issued to persons other than the defendants.  The jury could reasonably conclude based on Patel and Williams's testimony that the defendants knowingly and willfully converted the checks listed in the indictment to their own use by cashing them without the victims' knowledge or consent, and this Court will not disturb its findings of credibility.  See Chastain, 198 F.3d at 1351.

D.

Next, Jones and Jenkins challenge their convictions for aggravated identity theft. Section 1028A(a)(1) of Title 18 prohibits "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person" during the commission of an enumerated felony -- including embezzlement of government property. See § 1028A(c)(1). "[T]he term 'means of identification' means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including a person's "name, social security number, date of birth, official State or government issued . . . identification number . . . or taxpayer identification number." 18 U.S.C. § 1028(d)(7).

Here, Jones and Jenkins do not argue that they had "lawful authority" to sign any of the affected taxpayers' names or to cash their checks. See § 1028A. Rather, they make two different claims. First, they say that there was insufficient evidence to establish beyond a reasonable doubt that they knew the checks belonged to real people. Second, they argue that signing a person's signature is not "us[ing]" their "name" within the meaning of the statute. See §§ 1028A(a)(1), 1028(d)(7). In other words, Jones and Jenkins contend that, absent proof that they attempted to assume their victims' identities -- for example, by passing off stolen or counterfeit documents bearing the victims' information as their own -- they

17

cannot be convicted of aggravated identity theft.  Both arguments are without merit.

It is true that the government must prove beyond a reasonable doubt that the defendant knew he was using a means of identification that "in fact, belonged to another person."  Flores-Figueroa v. United States, 556 U.S. 646, 647 (2009) (internal quotation marks omitted).  In other words, the government must show that the defendant knew he was unlawfully using "a real ID belonging to another person rather than, say, a fake ID."  Id. at 648.  However, the government may rely on circumstantial evidence to prove that a defendant knew he was appropriating the identity of a real person.  See, e.g. United States v. Doe, 661 F.3d 550, 561 (11th Cir. 2011); United States v. Holmes, 595 F.3d 1255, 1258 (11th Cir. 2010) (per curiam).

In particular, we have held that a jury can "reasonably [infer]" that when federal and state governments "routinely obtain an applicant's identity," they use processes to "verify the authenticity of that identity."  United States v. Gomez-Castro, 605 F.3d 1245, 1249 (11th Cir. 2010); cf. United States v. Philidor, 717 F.3d 883, 885 (11th Cir. 2013) (per curiam) (finding that it was reasonable to infer, "[b]ased on the fact that the Internal Revenue Service issued refunds for tax returns listing [particular Social Security] numbers," that those "numbers corresponded to actual persons").  "The government [i]s not required to present any special proof"

18

that particular defendants knew about government verification procedures, because "'[t]hat knowledge can be inferred reasonably based on ordinary human experience'" and "'a trier of fact can rely on common sense.'" Doe, 661 F.3d at 562 (quoting Gomez-Castro, 605 F.3d at 1249 (second alteration in original)).

The jury could reasonably find based on "ordinary human experience" that the defendants knew that the stolen Treasury checks had been issued to real people. See id. Moreover, Patel testified that the defendants had repeated and consistent success cashing the checks over a period of weeks and that he verified the authenticity and amount of each check using the Treasury Department's website. Based on this information, the jury could reasonably find that Jones and Jenkins knew the checks were authentic and had been issued to real taxpayers.

The defendants' second argument is also unpersuasive. Two circuits have held that because "a signature is a form of a 'name' . . . it is a 'means of identification' under § 1028(d)(7)." United States v. Porter, 745 F.3d 1035, 1043 (10th Cir. 2014); accord. United States v. Blixt, 548 F.3d 882, 887 (9th Cir. 2008). This Court has reached the same conclusion in several unpublished cases. See, e.g., United States v. Little, 552 F. App'x 937, 939 (11th Cir. 2014) (per curiam); United States v. Shanks, 452 F. App'x 922, 926 (11th Cir. 2012) (per curiam); United States v. Lewis, 443 F. App'x 493, 496 (11th Cir. 2011) (per curiam).

19

Here, there was sufficient evidence in the record from which the jury could find beyond a reasonable doubt that Jones and Jenkins signed the checks, and thus used the names of the victims without lawful authority.  Williams testified that, to the best of his knowledge, Jenkins and Echols usually signed the checks. Additionally, ten of the twelve checks in his possession at the time of his arrest had not yet been signed, supporting the inference that they were to be signed by Jones and Jenkins upon Williams's arrival in Albany.

Moreover, despite the defendants' arguments to the contrary, there is no requirement that the government prove that Jones and Jenkins stole identification documents or falsely represented themselves to be their victims.  It need only show that Jones and Jenkins unlawfully used a means of identification belonging to someone else.  United States v. Hurtado, 508 F.3d 603, 607-08 (11th Cir. 2007) (holding that "lawful authority" refers to legal authority rather than the victim's permission), abrogated on other grounds by Flores-Figueroa v. United States, 556 U.S. 646 (2009).  Indeed, many convictions for aggravated identity theft involve defendants who wrote checks to themselves from other people's accounts or misused account information to which they had access.  See, e.g., Porter, 745 F.3d at 1037-38 (affirming conviction where defendant charged personal expenses on union credit card); United States v. Reynolds, 710 F.3d 434, 435-36 (D.C. Cir. 2013) (affirming defendant's conviction for using "digital versions of [four

20

officers'] signatures" to secure a credit line extension "in excess of the authority granted" to him as CFO).  Thus, the government was not required to show that Jones and Jenkins misrepresented themselves to be the people listed on each check; there was sufficient evidence presented at trial from which a reasonable jury could find Jones and Jenkins signed the checks without the lawful authority to do so.

E.

Additionally, Jones argues that there was insufficient evidence in the record to support his conviction for making misleading statements.  Because Jones challenges his conviction for making misleading statements for the first time on appeal, we review it only for plain error.  Hunerlach, 197 F.3d at 1068.

Section 1512(b)(3) of Title 18 criminalizes knowingly "engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication [of information relating to the commission or possible commission of a Federal offense] to a law enforcement officer."  The government bears the burden of proving beyond a reasonable doubt that the defendant "knowingly and willfully (1) engage[d] in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal official, (3) about the commission or the possible commission of a federal crime."  United States v. Ronda, 455 F.3d 1273, 1284 (11th Cir. 2006).

21

Here, the record contained sufficient evidence to support Jones's conviction for making misleading statements. The government presented a videotaped interview in which Jones repeatedly told Lieutenant Allen that he had never cashed Treasury checks at the Patels' BP and that no video footage would depict him doing so. The United States also produced surveillance tapes from the store and asked Patel to explain what was happening on screen. Patel explained to the jury that, in the video, he could be seen first holding a Treasury check and then handing cash to Jones. Jones argues that alternatively the video could easily just portray him receiving lottery winnings from Patel. However, we will not vacate a conviction simply because the government did not "disprove every reasonable hypothesis of innocence"; rather, we defer to the jury's rational selection between "reasonable constructions of the evidence." Mieres-Borges, 919 F.2d at 656 (internal quotation marks omitted). Here, the jury could reasonably have believed Patel's explanation of the surveillance footage, and thus concluded that Jones's statements to Lieutenant Allen were false statements intended to impede her investigation of his illegal check cashing activities.

## F.

Finally, Jenkins challenges the sufficiency of the evidence to support his conviction for mail and wire fraud conspiracy, which was based on his participation in a single conspiracy with Eatmon and others to fraudulently obtain

22

student loans.  The relevant statutes define fraud as "obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.  Section 1341 prohibits mail fraud, and Section 1343 prohibits committing fraud using "wire, radio, or television communication in interstate or foreign commerce."  The government must also prove each element of the three-part test for conspiracy: (1) "the existence of an agreement to achieve an unlawful objective"; (2) "the defendant's knowing and voluntary participation in the conspiracy"; and (3) "an overt act in furtherance of the conspiracy."  US Infrastructure, Inc., 576 F.3d at 1203.  "'[T]he government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud.'"  United States v. Broughton, 689 F.3d 1260, 1277 (11th Cir. 2012) (quoting United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003)).  "'[I]t is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable.'"  Id. (quoting Hasson, 333 F.3d at 1270).

Based on the evidence presented at trial, a reasonable jury could find, as it plainly did, Jenkins guilty of mail and wire fraud conspiracy for his involvement in Eatmon's student loan fraud scheme.  From Eatmon's testimony that she used the Internet to fill out and file the fraudulent FAFSAs, as well as to obtain the loan funds from the colleges, the jury could reasonably conclude that the use of

23

interstate wires was foreseeable.  The jury could credit Eatmon's testimony that Jenkins gave her his information and asked her to apply for a student loan on his behalf -- particularly when her testimony was corroborated by officials from the two colleges -- and that Jenkins knew she was unlawfully obtaining the loans. Lastly, a rational factfinder could find that Jenkins committed overt acts in furtherance of the conspiracy when he gave his information to Eatmon even though he had no intention of taking classes at either university.  Thus, there was ample evidence from which the jury could reasonably find that Jenkins knowingly participated in Eatmon's conspiracy.

Jenkins also argues that there was a variance between his indictment and the proof presented at trial.  In particular, he claims that the indictment charged him with fraudulently soliciting $335,693 in student loans in Count Ten, but that Eatmon's testimony only linked him to the loans she sought using his personal information.  However, we need not address this argument because Jenkins is not entitled to relief even if there was a variance.  A defendant who challenges his conviction on the grounds that he was prejudiced by a variance can achieve a reversal only if he shows:

> 1) that the proof at trial differed so greatly from the charges that [he] was unfairly surprised and was unable to prepare an adequate defense; or 2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another.

24

United States v. Barsoum, 763 F.3d 1321, 1330 (11th Cir. 2014).  Here, Jenkins

has not attempted to make the requisite showing.  Thus, he has failed to meet his

burden on this claim.

Accordingly, we affirm each of Jones and Jenkins's convictions.

AFFIRMED