[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11997
_____

D.C. Docket No. 1:18-cr-00111-TFM-B-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DAVID DOUGLAS DELGADO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(November 23, 2020)

Before NEWSOM and BRANCH, Circuit Judges, and BAKER, District Judge.[*]

BAKER, District Judge:

---

[*] Honorable R. Stan Baker, United States District Judge for the Southern District of Georgia, sitting by designation.

This appeal presents the first half of an old adage of trial advocacy which advises, "if the facts are against you, argue the law, and if the law is against you, argue the facts." The facts were certainly against Appellant David Douglas Delgado. Government agents intercepted two suspicious packages shipped from abroad that were addressed to Delgado at his residence in Chunchula, Alabama. The packages contained white powdery substances that testing later revealed to be unlawful controlled substances. Officers then conducted a search of Delgado's residence, pursuant to a search warrant, and found five unregistered homemade firearm silencers/suppressors. This evidence landed Delgado in United States District Court, where he faced federal controlled substances and firearms charges. In that court, Delgado unsuccessfully sought to suppress much of the evidence against him. Then, apparently recognizing the futility of a factual defense, he agreed to a bench trial with stipulated facts. Following that trial, the district court found Delgado guilty of knowingly importing approximately 2.62 grams of U-47700, a Schedule I controlled substance, in violation of 21 U.S.C. § 952, and possessing five firearm silencers, which had not been registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). The district court sentenced Delgado to thirty-six months' imprisonment as to each count, to run concurrently.

On appeal, Delgado continues to "argue the law" and raises the following

2

issues for our consideration:

> (1) whether the warrant for the search of Delgado's home (during which the silencers were discovered) was supported by probable cause;
>
> (2)  whether the Government presented sufficient evidence to permit the district court, in sentencing Delgado, to consider as relevant conduct Delgado's importation of the first intercepted package (for which he was originally indicted but never convicted due to the Government's dismissal of that specific count prior to trial); and
>
> (3) whether the district court erred in applying a sentencing enhancement, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(1), for the possession of a dangerous weapon.

Just as the facts were against Delgado as to the charges he faced in the district court, the law is against him as to each of the issues he raises on appeal.  Thus, after the benefit of oral argument, we will affirm.

## I

## A

Sometime in early June 2017, a package addressed to David Delgado at an address in Chunchula, Alabama, arrived at a Mobile, Alabama mail processing center.[1]  The package was labeled "beautiful white product" and had a return

---

[1] Throughout this opinion, we at times refer to this shipment as "the first package."

address in Hong Kong.  An inspector with the Department of Homeland Security

(the "DHS inspector"), along with an inspector with the United States Postal

Service, conducted an extended border search on the package and its contents,

pursuant to 19 U.S.C. § 482.  The package contained two bags of a powdery

substance which a field test indicated contained fentanyl or methamphetamine.

Laboratory testing later showed that the substance, which weighed a total of 9.81

grams, contained methoxyacetyl fentanyl.  At that time, Methoxyacetyl fentanyl

was considered an analogue of the controlled substance fentanyl.[2]

Later the same month, a second package, which was shipped from the same

Hong Kong address and addressed to David Delgado at the same Chunchula

address, arrived at the mail processing center.[3]  An extended border search

revealed that this package also held a powdery substance, which a field test

indicated contained fentanyl or methamphetamine.  Laboratory testing later

showed the substance contained 2.62 grams of U-47700, a Schedule I controlled

substance.

The DHS inspector conducted "[c]omputer queries" to confirm that David

---

[2]  The parties agree that, when Delgado ordered the first package, methoxyacetyl fentanyl was
not considered a controlled substance but was considered illegal pursuant to the Controlled
Substance Analogue Enforcement Act of 1986 ("Analogue Act").  The Analogue Act identifies a
category of substances substantially similar to those listed on the federal controlled substances
schedules, 21 U.S.C. § 802(32)(A), and instructs courts to treat those analogues as Schedule I
controlled substances if they are intended for human consumption, 21 U.S.C. § 813.

[3]  Throughout this opinion, we at times refer to this shipment as "the second package."

Delgado resided at the Chunchula, Alabama property (hereinafter, the "Property") to which the packages had been addressed. However, once it was determined that the packages contained illegal substances, law enforcement officials opted against having them delivered to the Property.

Instead, on June 22, 2017, Deputy Chedereick Thomas, with the Mobile County Sheriff's Department, applied for a warrant to search the Property. In his affidavit in support of the application, after reviewing his experience investigating drug-related crimes, Deputy Thomas described the two packages including their having been addressed to David Delgado at the Property, agents' interception and inspection of the packages and their contents, and the field tests that indicated that the powdery substances inside the packages contained fentanyl or methamphetamine. Deputy Thomas also explained that he searched county records and confirmed that the Property was indeed owned by Delgado and claimed by him as his residence. Deputy Thomas averred that he believed Delgado, or some other person with a connection to the Property, had ordered the two packages and had them shipped there. He explained that, in his experience, "those who receive shipments of narcotics via [the] United States Post Office commonly keep[] notes, and other documents related to their drug shipments," and that "[t]hese notes have . . . been found on computers and computer-related items." He also indicated that such persons often "keep photographs and video tapes of others who are involved

5

in the drug business." As a result, he explained, he believed "that there w[ould] be records and other receipts inside [the Property] related to the shipment of the two parcels . . . and possibly other previously received parcels containing illegal substances." According to the affidavit, "[t]hese documents, if located[,] can be of great evidentiary value to the investigation."

A judge with the District Court of Alabama in Mobile County issued the warrant for the search of the Property. The warrant described the "PROPERTY to be searched for and seized, if found," as: "Documents Related to the receipt of [the two packages]" and "Journals[,] Receipts, Lists, Books[,] and Papers related to the sale of a controlled substance[]," as well as "[a]ll raw materials, products and equipment of any kind which are used or intended for use in manufacturing, cultivating, compounding, processing, delivering, importing or exporting any controlled substance," and "[a]ll books, records and research products and material, including formulas, microfilm, tapes and data, which are used or intended for use in violation of any law of this state concerning a controlled substance." Lastly, the warrant stated that "[t]he GROUNDS for search are that said property will be used to commit the offense of: Unlawful Possession of Controlled Substance (to-wit: Fentanyl)."

Delgado was present at the search of the Property. During the search, officers found numerous firearms, as well as five homemade firearm

silencers/suppressors that Delgado admitted were not registered.  With the exception of two guns, all of his firearms were stored in gun safes at his home. The two guns that were not in a gun safe were a shotgun in his bedroom and a .38 caliber pistol he kept in his computer room.

## B

On April 26, 2018, Delgado was indicted on two counts in the United States District Court for the Southern District of Alabama: Count One charged him with violating 21 U.S.C. § 952 by importing the approximately 2.62 grams of U-47700 found in the second package, and Count Two charged him with knowingly possessing the five firearm silencers that had not been registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d).

Several months later, the Government filed a Superseding Indictment, adding—as the new Count One—a charge for importation of the methoxyacetyl fentanyl found in the first package, in violation of 21 U.S.C. §§ 952, 813, and 802(32)(A).  The original Count One—importation of U-47700 in the second package—became Count Two in the Superseding Indictment, and the original Count Two—possession of unregistered silencers—became Count Three.

After he was charged in the original two-count indictment, Delgado filed a motion to suppress the evidence found during the search of the Property.  He

7

argued that the search warrant was not based on an affidavit supplying sufficient information to support a finding of probable cause.[4] The Government responded by arguing (1) that officers had probable cause to obtain the search warrant for the Property because evidence related to the two shipments (which were being shipped to that very address) reasonably could be discovered there; and (2) that, regardless, the search fell within the "good faith exception" because the officers reasonably relied upon the search warrant when they executed it.

At a hearing on the motion to suppress, both Deputy Thomas and the DHS inspector testified about the basis for seeking the warrant, including the appearances and contents of the packages, the steps they took to confirm that the address on the packages was Delgado's residential address, and their decision to seek a warrant to search the Property rather than attempting a controlled delivery of the packages.[5] Each official also testified about his respective experience investigating narcotics cases, through which he learned that individuals who receive shipments of narcotics via the mail commonly keep notes and other documents related to their drug shipments at their home, and sometimes these

---

[4] While the motion to suppress included other challenges—for instance, a challenge to the initial seizure and search of the packages when they arrived at the postal center—Delgado has limited the issue on appeal to whether the warrant to search the Property was supported by probable cause.

[5] The DHS inspector testified that there was a locked gate at the Property, which deterred law enforcement agents from attempting a controlled delivery.

8

notes are stored on computers or in safes.  The testimony confirmed that, during the search, officers seized a computer, and they also searched a safe (where they found firearms and the unregistered silencers).

The district court denied Delgado's motion to suppress, reasoning that there had been two packages containing illegal substances, both addressed to the same individual at the same address, making it "extremely likely that any records, receipts, books and documents" concerning the order of either substance would be found at that address.  The court also concluded that computers fell within the scope of the search warrant since they could hold such documentation (in electronic form).  Finally, the court held that it was logical and legitimate to search and remove contents from safes at the Property, and that the silencers and firearms had been in plain view in the safes.

## C

On October 12, 2018, Delgado was arraigned as to the Superseding Indictment, and the Government then orally moved to dismiss Count One of the Superseding Indictment, which was unopposed by Delgado.  On that same date, Delgado also waived his right to a jury trial, and the district court conducted a bench trial.  The parties filed a Joint Stipulation of Facts in which Delgado admitted, *inter alia*: that he knowingly ordered the U-47700 from China to be shipped to the United States; that he knowingly possessed silencers as defined

under 18 U.S.C. § 921(a)(24); and that the silencers were not registered to him in the National Firearms Registration and Transfer Record, as required under 26 U.S.C. §§ 5845 and 5861(d).  The district court found Delgado guilty of both pending counts, Counts Two and Three of the Superseding Indictment.

Prior to Delgado's sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report, and Delgado objected to various aspects of that report before and during his sentencing hearing.  First, he objected to the substance found in the first package being included as part of his relevant conduct.  He argued that the Government could not show that he knew that substance was a controlled substance at the time he ordered it.  At the sentencing hearing, Delgado testified that he had ordered the substances in both packages after conducting research online to try to find legal alternatives to hydrocodone, which he had been taking for a back injury.  He stated that, when he placed the orders, he believed—based on what he had read on the internet—that the substances were not illegal.  He also stressed that, at the time he ordered it, the substance in the first package was an "analogue"—and was not yet specifically listed on the controlled substance schedules.  As a result, he argued, the Government could not prove that he knew it was a controlled substance.  In response, the Government argued there was sufficient circumstantial evidence to permit an inference that Delgado knew the substance was illegal and pointed to (1) the close similarity of the substance to

10

fentanyl; and (2) the difference between the proof necessary to criminally convict a defendant for violating a statute and the proof necessary to apply a sentencing guideline for violating the same statute.

Additionally, Delgado objected to the application of a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) based on his possession of a dangerous weapon in connection with a drug offense. He argued that the Government could not show that the firearms and silencers at his house were connected to his drug offense. During the sentencing hearing, Delgado testified that he had the weapons because he is an avid target shooter and long-time gun collector. He also argued that neither of the packages that had prompted the search had been delivered to him, so they were never actually in the home where the guns and silencers were found. Similarly (and finally), Delgado objected to the application of this enhancement because it precluded him from being eligible for a reduction pursuant to the Guidelines' safety valve provision. The Government responded that there was a sufficient link between the crime of importation and the possession of the weapons because Delgado researched and ordered the substances from his home and requested and expected to have them delivered to his home, which was where he possessed the numerous firearms and silencers.

In determining Delgado's sentence, the district court concluded that the first package would be considered relevant conduct, explaining that the close timing of

11

the two packages indicated that they were part of the same course of conduct because the timing was "consistent with a person who has established a source of supply and is trying to continue that source of supply." The court also noted that the small window of time between the two packages indicated that Delgado may have been distributing the substances, rather than simply ordering them for his personal usage. Based on these facts, the court treated the contents of both packages as relevant conduct.

The district court also concluded that the firearm enhancement applied under the facts presented. The court explained that "these firearms were available for [Delgado] should he need to protect himself or the drugs," and noted the presence of digital scales, the number of firearms, the fact that some firearms were outside of the safe, and the regular ordering of drugs on separate occasions. Moreover, the court observed that Delgado possessed not just firearms but illegal homemade silencers and that Delgado admitted to using some of the drugs he had previously obtained. The court explained, "when a person is using illicit drugs such as this and they have firearms available, that causes me even more concern."

After determining the applicable Guidelines range, the district court stated that, "if we lived in a world without [G]uidelines, [it] would find that this is the kind of an offense [for which] a person should receive anywhere from three to five years as a sentence." The court explained:

12

So my sentence will be, whether there was [G]uidelines or not—the [G]uidelines are advisory. But I would have—if the [G]uidelines were controlling and they—and I had to rule in favor of the defendant on his objections, I still would have departed upward to the sentence that I am going to give, because I think the facts and circumstances of this case would warrant that, and it is, I think, the appropriate sentence to impose.

A probation officer present at the hearing also noted that Delgado's total offense level (22) and Guidelines range (41 to 51 months) would be the same regardless of whether the court used the Guidelines calculation for the drug offense (as used in the Presentence Investigation Report) or instead used the calculation for the firearms charge. The court then heard argument from counsel regarding "the appropriate sentence to impose."

The district court sentenced Delgado to thirty-six months' imprisonment as to both Counts, with the terms to be served concurrently. In sentencing Delgado, the court stated the following:

> . . . I've considered the [S]entencing [G]uidelines and evaluated the reasonableness of the sentence through the lens of 18 U.S.[C. §] 3553(a). And I've also looked at the [G]uidelines which are advisory. And I find that the [G]uidelines range of 41 to 51 months is a bit over-representative of the seriousness of the defendant's conduct. So I am going to impose a sentence using the terms of 18 U.S.[C. §] 3553(a).

Delgado now appeals.

## II

Delgado argues that the district court erred in three ways: (1) by denying his motion to suppress and finding that the search warrant was supported by probable

13

cause; (2) by considering the methoxyacetyl fentanyl found in the first package as part of his relevant conduct at sentencing; and (3) by applying a sentencing enhancement, pursuant to U.S.S.G. § 2D1.1(b)(1), for the possession of a dangerous weapon.  We consider his arguments in turn.

## A

The Fourth Amendment to the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized."  U.S. Const. amend. IV.

Probable cause is "not a high bar."  *District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S. Ct. 577, 586, 199 L.Ed.2d 453 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103, 188 L.Ed.2d 46 (2014)).  The mere "probability or substantial chance of criminal activity" is all that is needed.  *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13, 103 S. Ct. 2317, 2335 n.13, 76 L. Ed. 2d 527 (1983)).  This "flexible and fluid concept" turns on examining all information together.  *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019).  Thus, in considering probable cause, we do not isolate events, but consider the "totality of the circumstances" to decide whether there was a "fair probability that contraband or evidence of a crime [would] be found in a particular place."  *United*

14

*States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *Gates*, 462 U.S. at 238). Nothing even approaching "conclusive proof or proof beyond a reasonable doubt" is required. *Paez*, 915 F.3d at 1286. An affidavit accompanying a warrant application supports probable cause when it "establish[es] a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

A district court's ruling on a motion to suppress presents a mixed question of law and fact. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam). We review findings of fact for clear error and the application of the law to the facts *de novo*. *United States v. Shabazz*, 887 F.3d 1204, 1213 (11th Cir. 2018). We construe all facts in the light most favorable to the party that prevailed below, which in this case is the Government. *Id.* The law requires us to give great deference to a district court's determination of probable cause. *Id.* at 1214.

Delgado contends the warrant for the search of his home and supporting affidavit were based on "speculation and [an] unsupported conclusion" by Deputy Thomas that illegal activity had taken place at Delgado's residence. Relatedly, he argues that, at the time the search warrant was issued, there were insufficient facts to supply a nexus between his residence and the illegal activity suggested by the packages. Delgado emphasizes that neither package was delivered to his residence

15

(so he never actually received and possessed either of them) and that there was no evidence indicating that either package was ordered from his residence (rather than from an office computer or a mobile phone).[6]

The facts supplied in Officer Thomas's affidavit, and verified at the hearing before the district court, thwart Delgado's arguments. The affidavit explained that two packages of white powdery substances, sent from a source in Hong Kong with which officials were familiar, were intercepted at the same postal center within weeks of each other. Testing revealed that the powdery substances contained fentanyl or methamphetamine. Agents did not need to risk having these dangerous substances delivered to confirm the connection between the illegal shipments and the Property. Both packages were addressed to Delgado at the Property, and the Property was not only owned by him but also readily confirmed by law enforcement to be his then-current residence. Had they not been intercepted, the packages of contraband would have been delivered, in due course, to Delgado at his residence. Additionally, Deputy Thomas explained that, in his experience, those who receive shipments of narcotics through the mail often keep notes and records related to their drug shipments at their homes, and they often store them on computers and computer-related items. As a result, it was reasonable to believe

---

[6] While Delgado's motion to suppress also specifically challenged the officers' search for and seizure of the firearms and suppressors during the search of the Property, he has not presented any argument on that basis on appeal and has thus abandoned that challenge.

16

that there was a probability or substantial chance that such records, notes and other documentation may be found at Delgado's residence.  Furthermore, the involved officials had no evidence or information that would have or should have diminished the probability or substantial chance that evidence of criminal activity would be found at the residence.  Construing these facts in the light most favorable to the Government, we find that the affidavit established the necessary connection between Delgado and the residence to be searched as well as the necessary link between the residence and the importation of illegal substances.  *See Martin*, 297 F.3d at 1314.  As a result, the district court did not err in denying Delgado's motion to suppress.

Moreover, even if Deputy Thomas's affidavit did not provide probable cause for the warrant, the evidence found during the search of Delgado's home would still be admissible under the good faith exception to the exclusionary rule, as set forth in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984).  The Supreme Court's decision in *Leon* "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause."  *Martin*, 297 F.3d at 1313.  Under this good faith exception to the exclusionary rule, suppression is necessary "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored

17

an objectively reasonable belief in the existence of probable cause." *Id.* (quotation and citation omitted).  While the district court did not base its denial of the motion to suppress on the good faith exception, both parties addressed this concept in the briefs and arguments they presented to that court.  There is no indication that any officer was dishonest or reckless in preparing the affidavit, nor is there a basis for finding that any involved officer could not have objectively reasonably believed there was probable cause to search Delgado's residence.  Additionally, the warrant adequately conveyed its parameters (documents related to the two shipments, as well as journals, receipts, lists, books, and papers related to the sale of controlled substances that had been dispensed or acquired) and, therefore, was not "so facially deficient" that it cannot be presumed to be valid.  *See Martin*, 297 F.3d at 1313 (quotation and citation omitted).  As a result, the good faith exception provides an additional and alternative basis for the Court to affirm the district court's ruling on the motion to suppress.

**B**

Delgado next challenges the district court's determination of his advisory sentencing range under the Sentencing Guidelines.  Specifically, he faults the district for considering the contents of the first package when assessing his relevant conduct.  As explained above, this package contained a controlled substance analogue and was the basis for Count One of the Superseding Indictment which the

18

Government dismissed just prior to trial.

Typically, when determining a convicted defendant's advisory sentencing range under the Guidelines, the sentencing court considers all "relevant conduct," which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction . . . ."  U.S.S.G. § 1B1.3(a)(1)(A).  Here, in determining Delgado's Guidelines range, the district court held Delgado accountable for the total weight of the substances in both packages.  The court rejected Delgado's argument that he should only be attributed the weight of the substance in the second package, which was the sole basis for his count of conviction.  We review that decision for clear error.  *See United States v. Chavez*, 584 F.3d 1354, 1367 (11th Cir. 2009) ("The district court's determination of the drug quantity attributable to a defendant is reviewed for clear error."); *see also United States v. Siegelman*, 786 F.3d 1322, 1332–33 (11th Cir. 2015) (recognizing that whether conduct qualifies as relevant conduct is reviewed for clear error).  "A finding is clearly erroneous where, after reviewing all the evidence, we are 'left with the definite and firm conviction that a mistake has been committed.'"  *United States v. Alicea*, 875 F.3d 606, 608 (11th Cir. 2017) (per curiam) (quoting *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007)).

19

Delgado claims the Government failed to provide sufficient evidence regarding the first package—particularly regarding his knowledge about the illegality of the substance contained therein—to permit the district court to consider the substance as part of his relevant conduct for purposes of setting his Guidelines base offense level.[7]  In support, he notes that "[t]he joint stipulation of facts[, which was presented to the Court at the bench trial,] d[id] not mention the facts of Count One, d[id] not mention the substance in the package related to Count One, and d[id] not mention the quantity of the substance alleged in Count One." He also emphasizes that he testified at the sentencing hearing that he had intended to purchase only legal substances, that he had specifically researched the substances to determine their legality before ordering them, and that, as far as he had been able to determine, the substance that was shipped in the first package was indeed legal.  Citing *McFadden v. United States*, 576 U.S. 186, 135 S. Ct. 2298, 192 L.Ed.2d 260 (2015), Delgado argues that, in order for his importation of the substance in the first package to be considered relevant conduct, the Government was required to prove, by a preponderance of the evidence, that he *knew* that the

---

[7]  While his brief frequently references the fact that the Government dismissed the count concerning the first package prior to trial, Delgado does not appear to argue that the district court was prohibited from considering his importation of the first package as relevant conduct merely because of that dismissal.  To the extent he intended to make such an argument, his challenge would fail.  *See United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006) (relevant conduct may include both uncharged and acquitted conduct that is proven by a preponderance of the evidence).

substance was illegal. He claims that the Government failed to make such a showing and, as a result, the district court erred in considering it as relevant conduct at sentencing.

In response, the Government argues that *McFadden* only defines the proof necessary to *convict* a defendant of possession with intent to distribute a controlled substance analogue under 21 U.S.C.A. § 841(a)(1). Since the district court did not *convict* Delgado of importing the analogue substance in the first package but only considered the package's contents during sentencing, the Government reasons that *McFadden* did not require it to prove that Delgado knew that the substance was illegal.[8]

---

[8] The Government also urges us to affirm Delgado's sentence pursuant to *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). Under *Keene*, "we need not review an issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020). In those circumstances, any error in the Guidelines calculation is harmless. *See id.* Here, the Government points to the following statements by the district court at sentencing: (1) even "if we lived in a world without [G]uidelines, [it] would find that this is the kind of an offense [for which] a person should receive anywhere from three to five years as a sentence"; and (2) even if it "had to rule in favor of the defendant on his objections, [it] still would have departed upward." The Government argues that these statements constitute a sufficient "*Keene* statement" and that we should deem the sentence substantively reasonable and therefore affirm it. In order for the Government's argument to prevail, we would have to find that the district court's explanation about its sentence qualified as a sufficiently clear statement "that [it] would impose the same sentence, even if [it] erred in calculating the [G]uidelines," *United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009). Here, given the abundance of evidence supporting the district court's relevant conduct determination and its decision to apply a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) (discussed in Section II.C, *infra*), we do not have to make this assessment. Nonetheless, we note that the district court did not make the supposed *Keene* statements at the time it pronounced the sentence as the Government implies but rather at the time it announced the Guidelines range. Additionally, between making the potential *Keene* statements and pronouncing the sentence, the court heard argument from counsel regarding the appropriate sentence. Further, the court indicated that it would have reached the

21

The Supreme Court in *McFadden* did not specifically address whether the Government must prove that a defendant knew of a controlled substance analogue's status in order for the defendant's possession of the analogue to be considered relevant conduct at sentencing. Additionally, the commentary accompanying the "Relevant Conduct" provision in the Sentencing Guidelines advises, "the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, *rather than on whether the defendant is criminally liable* for an offense as a principal, accomplice, or conspirator." U.S.S.G. § 1B1.3, cmt. 1 (emphasis supplied).

However, in this case, we need not decide whether the knowledge requirement established in *McFadden* applies to the determination of relevant conduct at sentencing. Even if the knowledge requirement applies in this context, the Government satisfied its burden of proof as to that requirement by a preponderance of the evidence. *See Hamaker*, 455 F.3d at 1336 (relevant conduct may include both uncharged and acquitted conduct that is proven by a preponderance of the evidence).

Pursuant to *McFadden*, to prove a defendant knew something was a

---

same *range* ("from three to five years")—not necessarily the same *sentence*—regardless of the Guidelines. To the extent the sentencing court intended to make a *Keene* statement, the better practice would be for the court to make clear at the time of pronouncing the sentence that it would reach the same sentence regardless of the Guidelines range.

controlled substance under federal law, the Government is not required to introduce direct evidence of such knowledge; instead, it may offer circumstantial evidence of that knowledge. 576 U.S. at 187 ("Th[e] knowledge requirement can be established in two ways: by evidence that a defendant knew that the substance he was distributing is controlled under the [Controlled Substance Act] or Analogue Act, regardless of whether he knew the substance's identity; or by evidence that the defendant knew the specific analogue he was distributing, even if he did not know its legal status as a controlled substance analogue.").

Here, there was enough circumstantial evidence to support a reasonable inference that Delgado knew the substance shipped in the first package was a controlled substance. Delgado ordered the substance in hopes that it would address his back pain. Although he had been taking hydrocodone prescribed by his physician, there was no evidence that he spoke with his physician about the new substance and whether it was legal for him to obtain it on his own. Instead, he claims he relied on a "Reddit sub-Reddit about research chemicals" that he found online, which he says led him to believe that the substance he ordered was legal. This was one of at least two substances that Delgado ordered from a source in Hong Kong within weeks of each other, both of which were determined to be illegal substances. As to the second package from this same source, Delgado stipulated that he knowingly ordered a controlled substance to be shipped to the

23

United States.  Additionally, when officers searched Delgado's residence, they found a third substance—"kratom"—which he admitted he knew was illegal to possess in Alabama.  Finally, we must give great deference to the district court's explicit rejection of Delgado's testimony that he performed research and believed the substance to be legal as not credible.  *See United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999).

Accordingly, the Government demonstrated, by a preponderance of evidence, that Delgado knew that the substance being shipped in the first package was not a legal substance.  As result, the district court did not err in considering that substance as relevant conduct when determining Delgado's Guidelines range.

## C

Finally, Delgado argues that the district court erred by applying a sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for his possession of firearms and silencers, which were found during the search of his home.  Delgado also challenges the application of this enhancement because it prevented him from receiving a two-level reduction under the safety valve,[9] which he says he otherwise would have been entitled to receive.

---

[9] When a defendant facing a mandatory minimum sentence pursuant to a statute shows that he meets five specific criteria, *see United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997), a Guidelines provision known as the "safety valve" requires the district court to instead impose a sentence without regard to the mandatory minimum.  18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2; *United States v. Quirante*, 486 F.3d 1273, 1275–76 (11th Cir. 2007).

Under the Guidelines, a two-level enhancement is appropriate when "a dangerous weapon (including a firearm) was possessed" in connection with a drug offense.  U.S.S.G. § 2D1.1(b)(1).  The commentary to this section confirms that this enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  *Id.*, cmt. 11(A).

The district court applied the enhancement when determining Delgado's Guidelines range based on evidence that, in addition to numerous firearms and silencers secured in safes, Delgado had a .38 pistol in his computer room and a shotgun in his bedroom.  Delgado—who says he had the firearms and silencers simply because he was a target shooter and an avid collector—argues that there was no evidence that he was involved in drug dealing.  He claims the evidence instead showed that the illegal substances—which were never actually delivered to his residence—were strictly intended for his own personal use.  He thus denies that there was sufficient evidence connecting his possession of the firearms to the drugs.  Delgado likens his situation to an example from Guidelines commentary, which advises that "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet," Application Note 11(A), U.S.S.G. § 2D1.1.

This Court has applied the § 2D1.1(b)(1) enhancement broadly when firearms are found in the same location where the defendant commits a controlled

25

substance offense.  *United States v. Hall*, 46 F.3d 62, 63 (11th Cir. 1995) (per curiam).  "[O]nce the Government has shown proximity of the firearm to the site of the charged offense, the evidentiary burden shifts to the defense to demonstrate that a connection between the weapon and the offense is 'clearly improbable.'"  *Id.* In *Hall*, we observed that a firearm was found near "several drug-related objects, located in the house where conversations concerning" the importation of marijuana had occurred.  *Id.* at 64.  Here, firearms and silencers were found in Delgado's home, in the same place where officers found digital scales and powders, including an additional illegal substance (kratom).  Two of the firearms were near his bed and near his computer.  Delgado's residence, where the firearms were found, was the intended destination for the shipments of illegal substances at issue in this case. Thus, the Government readily established an appropriate nexus between the firearms and the illegal substances.  While Delgado testified that he had the weapons for other reasons, he did not show that any connection between the weapons and the substances and scales was "clearly improbable."  As the district court soundly noted, "firearms can have more than one purpose" and "these firearms were available for [Delgado] should he need to protect himself or the drugs."  Accordingly, the district court did not err in enhancing Delgado's sentence under § 2D1.1(b)(1).

Because we find that the district court properly applied the § 2D1.1(b)(1)

enhancement, and the application of the enhancement was Delgado's sole ground for challenging the district court's refusal to apply the safety valve, we also find that he has failed to show any error in that refusal.

## III

For the foregoing reasons, we affirm the district court's judgment.

**AFFIRMED**.