**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-14255

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ALEXANDRE OVADIA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:24-cr-20164-DPG-1

_____

Before JORDAN, KIDD, and HULL, Circuit Judges.

PER CURIAM:

After a guilty plea, Alexandre Ovadia appeals his thirty-month prison sentence on his cyber harassment conviction under 18 U.S.C. § 2261A(2)(B). Particularly, Ovadia argues that the

evidence at his sentencing does not support the district court's finding that Ovadia used "credible threats of violence." That finding made Ovadia ineligible for a two-level reduction to his offense level under U.S.S.G. § 4C1.1, a provision for offenders with no criminal history points (the "zero-point offender reduction").

After careful review, we affirm Ovadia's sentence because the district court did not err in finding that Ovadia made credible threats of violence, thereby rendering him ineligible for the zero-point offender reduction. Alternatively, any error in not applying a two-level reduction under § 4C1.1 was harmless because (1) the district court made a *Keene*[1] statement that indicated he would have imposed a thirty-month prison sentence even with that § 4C1.1 reduction; and (2) Ovadia has not shown his thirty-month prison sentence was unreasonable under his lowered advisory guidelines range.[2]

## I.  FACTUAL BACKGROUND

From November 2022 to March 2024, Ovadia sent at least 217 threatening emails to various individuals. As Ovadia described to FBI agents, he sent the emails to combat a freemason-backed pedophilia ring that had infected the United States government.

---

[1] *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006).

[2] As detailed later, the § 4C1.1 reduction would have lowered Ovadia's advisory guideline range from 24-30 months imprisonment to 18-24 months imprisonment.

Ovadia sent emails to people he knew, including business associates and family members.

Ovadia's former business partner, "R.M.," who lived in Miami, Florida, was the target of numerous emails. Ovadia previously resided in Miami, but he sent these emails from Israel and Colorado.

Ovadia's emails were unhinged, often consisting of slur-ridden threats typed in all capital letters with numerous misspellings or non sequiturs. For example, Ovadia sent one email to R.M. that referred to R.M. as a homophobic slur and had a subject line stating, "I AM GOING TO KILL YOU." Another email to R.M. stated, "IM GOING TO DRILL HOLES THROUGH YOUR SKULL" and "IM GOING TO EAT YOUR FACE."

Several of Ovadia's emails suggest he knew the locations of the targets of his threats. First, in one particularly gruesome email sent to R.M., Ovadia threatened to rape R.M. and referenced R.M.'s residence in Miami, Florida, by writing, "[R.M.] local miami gay found in pieces in Biscayne bay . . . Police have no suspects." Second, Ovadia sent an email to R.M. suggesting Ovadia tracked or "logged" R.M., saying: "I'm going to kill you // ahahahHJJHHHahahhHHHHJ guess who hasn't moved from that shack in Normandy[, Florida] // AGHHH huess who still lives in

that revitz apt // Ahhahahah // Ur movements I have u logged // Looks like u don't make ur decisions // Ur just a pawn."[3]

Law enforcement traced back to Ovadia each email account used to send the threatening messages. Among other things, law enforcement subpoenaed Google and internet-service providers for account owner information and IP addresses.

In April 2024, when FBI agents intercepted Ovadia in the Miami airport upon his return from a trip to Israel, Ovadia admitted that he created two of the email addresses used to send the messages in this case. Ovadia further admitted that he sent an estimated 1,000 threatening emails to different people whom he believed to be pedophiles. Ovadia claimed that his threats were in response to threats he received from members of the pedophile ring, with Ovadia's goal being to "get on their level to be heard." Ovadia, however, did not provide the agents any proof that he had received any threats.

## II. PROCEDURAL HISTORY

### A. Indictment and Guilty Plea

In April 2024, a grand jury in the Southern District of Florida returned an indictment charging Ovadia with two counts of cyber

---

[3]This small sample of Ovadia's messages omits some of his more offensive language; we hesitate to commit his other vulgarities to paper. And it is unnecessary to do so to resolve the issues in this appeal.

harassment in violation of 18 U.S.C. § 2261A(2)(B).[4] Count 1 related to Ovadia's communications sent between November 2022 and March 2024 to one victim, R.M. Count 2 related to Ovadia's communications sent between September 2023 and March 2024 to another victim, M.K.

In September 2024, pursuant to a plea agreement, Ovadia pled guilty to Count 1. The government agreed to, and the district court later did, dismiss Count 2 of the indictment. Ovadia agreed to a factual proffer statement, wherein he stipulated that the facts were sufficient to prove the crime charged in Count 1 under 18 U.S.C. § 2261A(2)(B).

**B.     Presentence Investigation Report**

A probation officer prepared a presentence investigation report ("PSI") using the 2024 Sentencing Guidelines manual. For Ovadia's conviction on Count 1, the PSI calculated a total offense level of 19, consisting of: (1) a base offense level of 18 pursuant to U.S.S.G. § 2A6.2(a); (2) a four-level increase because the offense involved "a pattern of activity involving stalking, threatening,

---

[4] 18 U.S.C. § 2261A(2)(B) makes it unlawful for any person to "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, use[] the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A)."

24-14255               Opinion of the Court                    6

harassing, or assaulting the same victim," pursuant to U.S.S.G. § 2A6.2(b)(1); (3) a two-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a); and (4) an additional one-level decrease for Ovadia timely notifying the government of his intent to plead guilty, pursuant to U.S.S.G. § 3E1.1(b).

With a total offense level of 19 and a criminal history category of I, the PSI calculated Ovadia's advisory guidelines range on Count 1 to be 30 to 37 months of imprisonment.

## C.    Ovadia's Criminal History

Although the PSI assigned Ovadia zero criminal history points, it listed other arrests and pending charges involving Ovadia. Several of these matters involved Ovadia engaging in threatening and aggressive conduct. For example, in 2021, Ovadia was arrested for battery on a law enforcement officer in Hollywood, Florida. *See* Fla. Stat. § 784.07. In 2023, Ovadia was arrested in Summit County, Colorado, on charges of committing (1) felony menacing, (2) a bias motivated crime, and (3) harassment by striking, kicking, or shoving. *See* Colo. Rev. Stat. §§ 18-3-206, 18-9-121, 18-9-111. Both of these criminal matters remained pending as of the PSI's preparation date.[5]

---

[5]Relatedly, a civil action was filed against Ovadia in 2021, and the petitioner sought a domestic violence injunction against Ovadia for conduct involving stalking. That civil case has been closed, and the PSI does not disclose the outcome of the litigation.

As relevant here, the PSI disclosed that Ovadia had an additional run-in with law enforcement—this time initiated by Ovadia. In August 2023, Ovadia went to an FBI office in Denver, Colorado. There, Ovadia (1) complained agents were not doing enough to address the hacking of his cell phone, and (2) requested an FBI badge and gun so he could handle the matter himself. When his request was denied, Ovadia became verbally abusive and, using vulgar language, accused the FBI agent of being a pedophile. Ovadia complied when asked to leave, but he continued to use offensive language as he departed the FBI office.

The PSI also included descriptions of four disciplinary infractions committed by Ovadia while in federal custody. According to Federal Bureau of Prisons ("BOP") records, Ovadia was sanctioned, convicted, and punished for various instances of refusing to obey orders, being insolent to staff members, refusing to stand for count, and telephone abuse.

## D.    Ovadia's Objections to the PSI

Ovadia made two guidelines objections to the PSI.[6]

1.    U.S.S.G. § 2A6.2(b)(1)—Pattern of Harassing Same Victim

Ovadia argued he should receive only a two-level increase to his offense level under U.S.S.G. § 2A6.2(b)(1), rather than the

---

[6]Ovadia made several objections to the facts and the recommended special conditions of supervised release included in the PSI. On appeal, no party raises any issues relating to these objections.

four-level increase included in the PSI. Section 2A6.2(b)(1) includes five categories of aggravating factors and requires (1) a two-level increase if the offense involves one category, or (2) a four-level increase if the offense involves two or more categories. Ovadia highlighted that the PSI included only one aggravating factor, to wit: a pattern of criminal activity involving the same victim. Thus, Ovadia argued this meant that his offense level should have been increased by only two levels, not four levels under § 2A6.2(b)(1).

The government also objected to the PSI's treatment of U.S.S.G. § 2A6.2(b)(1). The government pointed out that the PSI failed to include a description of a second aggravating factor when applying the four-level increase under § 2A6.2(b)(1). The government argued that two aggravating factors applied to Ovadia's conduct because Ovadia, in addition to engaging in a pattern of harassing or threatening the same victim, also threatened to use a dangerous weapon when Ovadia said that (1) he would drill holes in a victim's skull; and (2) the victim's body would be found in pieces in the Biscayne Bay. *See* U.S.S.G. § 2A6.2(b)(1)(D) (including "possession, or threatened use, of a dangerous weapon" as an aggravating factor). Thus, the government contended a four-level increase should still apply.

2.     U.S.S.G. § 4C1.1—Zero-Point Offender Reduction

More importantly to this appeal, Ovadia argued he should receive a two-level reduction to his offense level under U.S.S.G. § 4C1.1, which provides a potential reduction for offenders with zero criminal history points. The PSI did not mention § 4C1.1 or

explain why Ovadia, who had zero criminal history points, was ineligible for the zero-point offender reduction in § 4C1.1.

### E.    Sentencing Hearing—Guidelines Objections

#### 1.      U.S.S.G. § 2A6.2(b)(1)

At Ovadia's December 2024 sentencing hearing, the district court began by addressing whether Ovadia's conduct involved two or more aggravating factors such that a four-level increase was required under U.S.S.G. § 2A6.2(b)(1). The district court found the record, including the PSI's sample of Ovadia's messages, did not contain any explicit reference to a dangerous weapon sufficient to establish a second aggravating factor under § 2A6.2(b)(1)(D).[7] Therefore, the district court sustained Ovadia's first objection, overruled the government's objection, and stated it would impose a two-level increase under § 2A6.2(b)(1) rather than the four-level increase included in the PSI. The government does not appeal this ruling.

#### 2.      U.S.S.G. § 4C1.1(a)(3)

The district court also elicited the government's position on Ovadia's second objection as to § 4C1.1. The government stated that it did not believe the zero-point offender reduction should

---

[7]Additionally, the district court declined to consider an email included in an addendum to the PSI wherein Ovadia wrote, "LOL IM COMING TO MIAMI WITH GERNAADES AND I HAVE ADDRESSES SHAHAHAHHAHAHAHA AAIM GOING TO BOMB YOU ALL." The district court reasoned that the threat did not relate to a victim identified in the indictment or PSI.

apply because Ovadia made "credible threats of violence" against the victims. U.S.S.G. § 4C1.1(a)(3).

Ovadia responded that his threats were not credible, in part because nothing in the PSI suggested Ovadia took any steps to carry out the threats he made via email. In response, the government highlighted messages that suggested Ovadia knew where his victims resided. Particularly, the government quoted the email wherein Ovadia, in part, said: "[G]uess who hasn't moved from that shack in Normandy? . . . Ur movements I have u logged."

The government provided some details, not found in the PSI or factual proffer, when it explained that the "shack in Normandy" email demonstrated that Ovadia knew where the targets of his threats resided. For example, the prosecutor represented that R.M. lived in Normandy: "From this, it's clear that the defendant knows where this victim lives, and this victim, who is the named victim in this indictment . . . actually did live in Normandy at that time." Isle of Normandy is a neighborhood of Miami Beach, Florida. Ovadia did not object to the prosecutor's representations regarding R.M.'s residence.

The prosecutor continued to add: "At the time that this particular e-mail was sent, the defendant was actually still located in Miami. He was not in Israel or Colorado like [when] some of the other threatening emails . . . were sent." Counsel for Ovadia immediately corrected the prosecutor's statement and pointed out Ovadia was in Israel on February 19, 2024, when the "shack in Normandy" email was sent. It is not disputed, however, that

24-14255              Opinion of the Court                11

Ovadia was originally from Miami and, indeed, was arrested at the Miami airport upon return from Israel in April 2024.

The district court overruled Ovadia's objection and found Ovadia was disqualified for the § 4C1.1 zero-point offender reduction because he had made credible threats of violence in connection with the offense. The district court found that a reasonable person would find Ovadia's threats to be credible considering the totality of the circumstances, including "the volume and frequency of the threats, the fact that the defendant was very familiar with the victims and their whereabouts, and in specifically identifying the victim's current location." After Ovadia's counsel contended that a determination of credibility from a victim's subjective viewpoint was inappropriate, the district court reiterated that it was making an objective determination of credibility. Ultimately, the district court did not reduce Ovadia's offense level by two levels pursuant to the zero-point offender adjustment in § 4C1.1.

## F.    Recalculated Advisory Guidelines Range

After the district court's rulings on the guidelines objections, Ovadia's recalculated total offense level was 17—two levels lower than the offense level in the PSI—due to the application of a two-level, rather than a four-level, "pattern of activity" increase pursuant to U.S.S.G. § 2A6.2(b)(1). Ovadia's total offense level of 17 and a criminal history category of I yielded a recalculated advisory guidelines range of 24 to 30 months of imprisonment.

## G.    Arguments and Allocution

The government requested that Ovadia be sentenced to thirty months of imprisonment, the top of the recalculated guidelines range. After briefly summarizing the nature and circumstances of Ovadia's offense, the government read victim statements from R.M. and M.K. Both victims described needing therapy to cope with Ovadia's emotionally distressing messages. Both victims suggested Ovadia's threats led to strained relationships with business partners who either became aware of Ovadia's messages or themselves received threats from Ovadia. Lastly, the government described the incident leading to Ovadia's criminal charges in Colorado, which it said showed Ovadia "actually does move forward and try to accomplish the threats that he makes to his victims . . . if they are in his face."[8]

Ovadia requested an eighteen-month, below-guidelines sentence. Ovadia's counsel justified the request by highlighting that Ovadia (1) was "struggling with intense drug addiction," (2) had no prior criminal convictions, (3) made no attempt to carry out his threats, and (4) accepted responsibility for his conduct from the moment of his arrest in the Miami airport. The district court asked Ovadia's counsel what it should make of Ovadia's multiple

---

[8]At the sentencing hearing, Ovadia, through counsel, "denie[d] the allegations" relating to his Colorado arrest and questioned the credibility of the incident report. Ovadia clarified that he "object[ed] . . . to the information alleging that he committed a crime in connection with this pending [Colorado] case."

disciplinary sanctions from the BOP, something the district court found "rare" and "unusual" to see in a PSI. Ovadia's counsel described the incidents as "minor disciplinary incidents" that were "reflective of someone that's never been in jail before."

Ovadia briefly allocuted. Ovadia attributed his conduct to his having "overexerted [his] freedom of speech." Ovadia stated that he was the first person to go to the FBI to report R.M. When the district court asked why Ovadia reported R.M. to the FBI, Ovadia responded, "Well, Your Honor, I was being hacked."

## H.　District Court's Imposition of Sentence

The district court sentenced Ovadia to thirty-months imprisonment, followed by three years of supervised release. Ovadia objected to the denial of the § 4C1.1 zero-point offender reduction and the district court's finding that his threats were credible. The district court responded in effect that, even with the zero-point offender reduction, the sentence would not be less than thirty months. In full, the district court said:

> Okay. Your objections are noted but I will say, even if I had given the defendant that reduction, I think I am pretty confident that I would end up back in the same place as far as the 30-month sentence. Had he -- even if he qualified for the four-level enhancement, I was prepared to sentence him higher than the 30 months. I lowered that having considered the fact that I felt that only a two-level reduction should have been given, but having considered all the 3553(a) factors and the circumstances here, I just can't

imagine a scenario where less than the 30 months is warranted but your objections are noted.

Ovadia timely appealed.

## III.  STANDARD OF REVIEW

"We review *de novo* the interpretation and application of the Sentencing Guidelines." *United States v. Kluge*, 147 F.4th 1291, 1296 (11th Cir. 2025) (quoting *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (en banc)). The district court's factual findings at sentencing, however, are reviewed under the clearly erroneous standard. *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017) (citations omitted).

We will reverse a sentence as "substantively unreasonable" only if the district court committed an abuse of discretion in imposing the sentence. *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).

## IV.  DISCUSSION

### A.    U.S.S.G. § 4C1.1—Zero-Point Offender Reduction

On appeal, Ovadia argues that the district court erroneously found him ineligible for a zero-point offender reduction under U.S.S.G. § 4C1.1. Ovadia contends that no evidence supported the district court's finding that he made credible threats of violence in connection with his offense.

As background, U.S.S.G. § 4C1.1 requires that the defendant's offense level be decreased by two levels if the defendant (1) "did not receive any criminal history points"; and

(2) meets ten other criteria enumerated in § 4C1.1(a). U.S.S.G. § 4C1.1(a)(1)-(11). As relevant here, one of the ten remaining criteria to receive a § 4C1.1 reduction is that "the defendant did not use violence or *credible threats of violence* in connection with the offense." U.S.S.G. § 4C1.1(a)(3) (emphasis added).[9]

A defendant bears the burden of showing a sentence reduction is required under § 4C1.1. *See United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989) ("The guidelines contemplate that . . . the defendant has the burden of proving the applicability of guideline sections which would reduce the offense level.").

**B.    "Credible Threats of Violence"**

The phrase "credible threats of violence" or nearly identical language appears in the text of the Sentencing Guidelines several times, but never receives a definition from the Guidelines' text or commentary. *See* U.S.S.G. §§ 2D1.1(b)(2), 4C1.1(a)(3), 5C1.2(a)(2). It also does not appear that any circuit has undertaken to define the phrase in any detail.

No matter, because "[t]he language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Rogers*, 989 F.3d 1255, 1261 (11th Cir. 2021) (quotations omitted). Dictionary definitions can provide guidance to understanding a term's ordinary meaning. *Kluge*, 147 F.4th at 1298.

---

[9]On appeal, the government does not contend any other provision in § 4C1.1(a) bars Ovadia from receiving the zero-point offender reduction.

"Credible" is an adjective defined as "offering reasonable grounds for being believed or trusted." Merriam-Webster, https://perma.cc/AP7R-258Y (last visited Nov. 5, 2025). Black's Law Dictionary defines "threat" as a "communicated intent to inflict harm or loss on another or on another's property." *Threat*, Black's Law Dictionary (12th ed. 2024). Thus, a combination of the two definitions means a "credible threat" is a reasonably believable communication of an intent to inflict harm.

Ovadia has not shown there was no evidence to support the district court's finding that his threats were credible.

Instead, the undisputed facts in the PSI and factual proffer statement provided sufficient evidentiary support for the district court's finding that Ovadia's emails were reasonably believable communications of an intent to inflict harm. No one disputes that Ovadia's messages, which described the graphic killing, rape, and torture of the recipients, expressed an intent to inflict harm through violence. Ovadia's threats were reasonably believable too. This is not a case where the harasser did not actually know his victims. Rather, Ovadia obsessively sent hundreds of emails to former business partners and family members he personally knew and claimed to be tracking. Given his personal relationships with the recipients, he believably claimed to know where the threatened victims lived.

Ovadia argues his messages were not "credible" threats because he sent the messages from Colorado or Israel and lacked immediate physical proximity to the victims located in Florida. But

Ovadia ignores evidence that he had lived in Florida and was even arrested in the Miami Airport upon his return from Israel. It is reasonable to believe an individual capable of such repeated, obsessive behavior of sending 217 threatening emails would travel to his former home state and act on his threats made to one or more of his former business partners or family members. That Ovadia later told FBI agents he was only responding to threats sent to him so that he could be "heard" does not change that his outward manifestations made his threats believable.

Ovadia's argument that the district court improperly relied on unsupported factual proffers made by the government at the sentencing hearing lacks merit. The district court found Ovadia's conduct involved "specifically identifying the victim's current location." Ovadia contends the district court improperly relied on the prosecutor's statement that R.M. lived in Normandy—a neighborhood in Miami Beach referenced in an email to R.M. It is true that "absent a stipulation or agreement between the parties, an attorney's factual assertions at a sentencing hearing do not constitute evidence that a district court can rely on." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (citations omitted). Ovadia, however, did not object during sentencing to the prosecutor's representation that R.M. lived in Normandy.

Even setting the Normandy representation aside, the PSI disclosed that (1) R.M. lived in Miami; (2) Ovadia indicated in at least one email that he knew R.M. lived in Miami; and (3) Ovadia stated that he had R.M. "logged."

24-14255                Opinion of the Court                18

At bottom, we conclude that Ovadia has shown no error in the district court's finding that Ovadia made "credible threats of violence" such that he was ineligible for a zero-point offender reduction to his offense level under § 4C1.1(a)(3).[10]

## C.    Assumed Error Harmlessness

Even if the district court had erred by failing to reduce Ovadia's offense level by two levels based on the zero-point offender reduction under § 4C1.1, we would not vacate Ovadia's sentence and remand for resentencing. That is because (1) the district court stated, in effect, that it would have imposed a thirty-month prison sentence regardless of its resolution of the § 4C1.1 issue; and (2) Ovadia has not shown his thirty-month prison sentence is substantively unreasonable under the totality of the circumstances here.

"Under our precedent, we need not review a sentencing issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence

---

[10]We do not consider Ovadia's undeveloped argument—raised for the first time in his Reply Brief—that the district court applied the wrong legal standard when it determined whether Ovadia's threats were credible by using a reasonable person test. *See Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1326 n.15 (11th Cir. 2021) ("[W]e do not consider arguments fairly raised for the first time in reply briefs."). Even so, we note that Ovadia's argument on this point is dubious. As we have explained, whether a credible threat of violence was made involves examining from an objective viewpoint whether the threats were *reasonably* believable. The district court applied this objective standard, finding "objectively, anyone under those circumstances would believe that these threats of violence were credible."

is substantively reasonable." *United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022) (citation modified). A district court's choice to make a so-called "*Keene* statement," therefore, can trigger an "assumed error harmlessness inquiry." *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). We undertake that assumed error inquiry.

### 1.    *Keene* Statement

Ovadia first argues the district court did not make a sufficiently clear *Keene* statement. We disagree.

The district court did begin in an equivocal manner by saying, "[E]ven if I had given the defendant that reduction, I think I am pretty confident that I would end up back in the same place as far as the 30-month sentence." But the district court further clarified that a thirty-month sentence would have been imposed regardless of the § 4C1.1 issue by saying, "[H]aving considered all the 3553(a) factors and the circumstances here, I just can't imagine a scenario where less than the 30 months is warranted but your objections are noted."

While not perfect, the district court's *Keene* statement was adequate because it (1) was made just after pronouncing the sentence; and (2) indicated the district court would reach the same sentence regardless of its resolution of the § 4C1.1 guideline issue. *See United States v. Delgado*, 981 F.3d 889, 900 n.8 (11th Cir. 2020) (noting for *Keene* statements that district courts should "make clear at the time of pronouncing the sentence that it would reach the same sentence regardless of the Guidelines range").

24-14255                Opinion of the Court                20

### 2.    Substantive Reasonableness

Even if the *Keene* statement was adequate, Ovadia next argues his thirty-month prison sentence was substantively unreasonable under his lowered advisory guidelines range. If Ovadia had received a two-level reduction to his offense level under § 4C1.1, his total offense level would have been 15, rather than 17. With a total offense level of 15 and a criminal history category of I, Ovadia's advisory guidelines range would have been lowered to 18 to 24 months. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

Determining the substantive reasonableness of a sentence requires us to look at the "totality of the circumstances." *Grushko*, 50 F.4th at 19 (citing *Pugh*, 515 F.3d at 1190). In imposing a sentence, the district court must consider all the factors set forth in 18 U.S.C. § 3553(a), "but it may give greater weight to some factors over others or even attach great weight to a single factor." *Id.* (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015)).[11] The defendant bears the burden to prove his sentence is unreasonable. *Id.* at 18 (citations omitted).

---

[11] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed education or vocational training or medical care; (6) the kinds of sentences available; (7) the sentencing guidelines range; (8) pertinent policy statements of the sentencing commission; (9) the need to avoid unwarranted sentencing

While "the district court has discretion to impose a sentence outside of the guidelines range, a major variance requires a more significant justification than a minor one." *Id.* at 20 (citations omitted). "We will vacate a sentence only if we are left with the 'definite and firm' conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors." *Id.* (citations omitted). And we do not presume a sentence outside the guidelines range is unreasonable. *Id.* (citation omitted).

Given the lowered guidelines range of 18 to 24 months, the § 3553(a) factors, and the totality of the circumstances, Ovadia still has not shown his thirty-month prison sentence is substantively unreasonable. We recognize that a thirty-month prison sentence is a six-month upward variance from the top of the lowered guidelines range. But in imposing that sentence, the district court stated that it considered the PSI, statements of the parties, and the § 3553(a) factors. The district court had before it evidence that (1) Ovadia sent emails that were rife with offensive slurs and threatened to rape, torture, and kill his victims in graphic detail; (2) both victims named in the indictment sought therapy due to Ovadia's threats; (3) Ovadia expressed no remorse and seemed to begin to deny culpability for the threats, saying he was "hacked"; (4) Ovadia had two pending criminal cases involving aggressive or threatening conduct; and (5) Ovadia had four disciplinary sanctions while in federal custody. Under these circumstances, we cannot say

---

disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

a decision to vary upwards by six months from the lowered guidelines range was substantively unreasonable. Lastly, we note that Ovadia's thirty-month prison sentence is only half of the sixty-month statutory maximum for a cyber harassment conviction, another indication his sentence is reasonable. *See Grushko*, 50 F.4th at 20 ("[A] sentence imposed below the statutory maximum penalty is an indicator of a reasonable sentence."); 18 U.S.C. § 2261(b)(5) (providing statutory maximum).

Ultimately, even if the district court erred by not reducing Ovadia's offense level pursuant to § 4C1.1, any error was harmless because the district court would have still sentenced Ovadia to thirty-months imprisonment, which is a substantively reasonable sentence under Ovadia's lowered advisory guidelines range.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** Ovadia's thirty-month sentence of imprisonment, followed by three years of supervised release.

**AFFIRMED.**