**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-12377

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MICHAEL JOE GREEN, II,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:22-cr-00026-MCR-1

_____

Before ROSENBAUM, NEWSOM, and KIDD, Circuit Judges.

PER CURIAM:

A jury found Michael Green, II, guilty of committing two controlled substance offenses, and the district court sentenced him to 360 months of imprisonment. Green now appeals and challenges

the denial of his suppression motion, the sufficiency of the trial evidence, and the reasonableness of his sentence. After careful review, we affirm.

## I. BACKGROUND

In July 2021, the United States Postal Inspection Service intercepted a package containing 5.3 pounds of cocaine sent from Bianca Williams in Houston, Texas, to Green's mother, Linda Green ("Linda"), in Pensacola, Florida. When agents questioned Linda, she said that Green asked her to pick up the package for him.

Recognizing Green's name, agents began questioning informants, albeit of "un-tested reliability," about Green's involvement in the illegal drug trade. One informant identified Green from a picture, as they had previously purchased cocaine from him, and described Green as "living out of different hotel rooms and houses, driving multiple rental vehicles, and utilizing different phones." Another informant said that Green had historically been "an 'enforcer' for . . . local gangs and drug dealers," but in recent years had become involved in "large-scale" cocaine distribution. The informant also identified Green's purported associates and explained how Green transported drugs from Texas to Florida either by mail or by car. A third informant provided a phone number for Green and called the number in police presence to attempt to arrange a drug buy. Investigators surveilling Green also witnessed him conduct what they believed to be a drug deal with a known "narcotics violator."

Based on this information, a state court judge issued a warrant authorizing the installation of a pen register and the collection of Global Positioning System ("GPS") tracking data for Green's phone for 45 days. Through this GPS tracking, investigators observed Green make several car trips to Houston, where he would stay only for a short time and make several stops, often near post offices, and then return to a Pensacola residence located at 7462 Northpointe Boulevard ("Northpointe"). During one of these trips, Green made several phone calls to a number linked to a "known illegal narcotics distributor within Escambia County." Further, in January 2022, officers discovered narcotics in a Pensacola hotel room while attempting to execute a felony arrest warrant for a suspected drug dealer. During their search of the hotel room, Green knocked, but stated that he had the "wrong room" and quickly left when police answered the door.

Officers supplemented their previous search warrant application with this information and asked to renew the warrant to track Green's phone. The state court judge granted this request. And, following further investigation into Green, officers applied for and received search warrants for the homes Green frequented while in Pensacola: Northpointe and 1869 Southbay Drive ("Southbay"). Officers executed those warrants in late February 2023 and found cocaine, pills, and loaded firearms, among other things.

The same day Northpointe and Southbay were searched, Green was traveling through Louisiana in a two-car convoy on his

way back to Pensacola from Houston. Green was driving a Dodge while Ashton Forbes was driving a Ford with Green's estranged wife, Octavia Green ("Octavia"), as a passenger. Louisiana officers pulled over the Ford for a moving violation, searched the car with Forbes's consent, and found cocaine and pills.

Shortly thereafter, Green was indicted for (1) conspiring to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), (viii) and 846 (Count One), (2) distributing 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2 (Count Two), and (3) possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Three).

### A. *Motion To Suppress*

Green filed a suppression motion challenging, in relevant part: (1) the traffic stop and search of the Ford, (2) the sufficiency of the warrants to search Northpointe and Southbay, and (3) the sufficiency of the renewed cell phone warrant.

The district court denied Green's motion. First, the court found that Green did not have standing to contest the stop and search of the Ford because he did not own the car, was not on the rental agreement, and was not present in the car during the search. Second, it found that the warrants to search Northpoint and Southbay were supported by probable cause, and even assuming that probable cause was lacking, "the officers were allowed to rely in good faith on the [Northpoint and Southbay] warrants, and there [wa]s no evidence that they did not." Third, the court found no

grounds for suppressing the evidence garnered from the renewed cell phone warrant. It explained that the application did not merely recite the information used to support the original warrant, but rather included the new information gathered from "the surveillance that had occurred . . . and with use of the pen register," including details about Green's 24-hour round trips from Pensacola to Houston and calls "to other known drug users and distributors," as well as the affiant officer's belief, from his training and experience, "that the circumstances were indicative of illegal drug activity."

## B. *Trial*

Green proceeded to trial in February 2023. We will briefly summarize the evidence relevant to our analysis, beginning with the testimony the government presented from law enforcement witnesses that established the following.

A postal inspector flagged the parcel sent to Linda as suspicious because (1) it was sent from Houston, a known source city for illegal drugs; (2) it was heavier than a typical priority mail parcel; (3) the return address belonged to an apartment complex but was misspelled and did not contain a unit number; and (4) the postage was paid in cash. The package contained packing peanuts and a "Vaultz" lockbox. Inside the lockbox were dryer sheets and vacuum-sealed bags of cocaine wrapped in pink duct tape, which totaled 5.3 pounds. Video footage from the Houston post office and fingerprints found on the outside of the box indicated that Khadija Williams ("Khadija"), Green's girlfriend, was the person who mailed the parcel. Green's fingerprints were not found on the

inside or outside of the package, nor did he appear in the post office surveillance footage.

The postal inspector resealed the parcel and allowed Linda to pick up her package, but officers were waiting for her once she left the building. Once Linda saw the police, she set down the package and "spontaneous[ly]" said, "I didn't know that was in there." Linda was taken to the sheriff's office, and during questioning, her phone repeatedly kept ringing with the name "Michael Joe II" displaying on the screen.

Officers obtained a warrant for Linda's phone, and the extracted data revealed that the number saved as "Michael Joe II," which was registered to Green as "the device holder," texted Linda a picture of the tracking number for the seized parcel on July 19, 2021. Linda and "Michael Joe II" also exchanged several additional messages between July 19 and July 22, in which "Michael Joe II" discussed the status of the delivery and insisted that Linda pick up the package as soon as possible. On July 22, the date the package was intercepted by police, Green, using the "Michael Joe II" number, also spoke with his incarcerated adult son on recorded jail calls about the delivery, stating that he sent his mother clothes and would "never send [her] drugs." However, the officer who reviewed the recorded calls testified that, in his experience, "individuals would be more careful than to state something [as] explicit" as "'I sent someone cocaine' on a recorded line."

Through online searches, agents discovered that the "distinctive" "Vaultz" lockbox found inside the seized package was

available for purchase at Office Depot. In a surveillance video from an Office Depot five miles from the Houston post office, Green and Khadija can be seen entering the store on the afternoon of July 13 and checking out together. In the checkout line, Green was holding, among other things, a "Vaultz" lockbox, two bags of shipping peanuts, and plastic wrap, and Khadija was holding a cardboard box. According to the receipt, Green purchased two drinks, the "Vaultz" lockbox, stretch film, tape with a dispenser, 9-inch shears, a fine-tip black Sharpie marker, a corrugated box, and loose fill peanuts.

Following the incident with the package, officers surveilled Green and began tracking the GPS data on his phone. Green was seen driving multiple rental cars and made the 16-hour roundtrip from Pensacola to Houston, a source city for cocaine and methamphetamine because of its proximity to the Mexico border, usually once or twice a week. When Green would return to Pensacola, he would go to either Northpointe or Southbay and stay at these locations for varying degrees of time. Based on their investigation, Florida officers knew that Green and two others would be traveling through Louisiana on one of these trips in a rented Ford and Dodge on February 27, 2022, and they notified the local authorities.

A Louisiana officer pulled over the Ford, which was traveling "within seconds of" the Dodge, after he observed it improperly maintaining the left lane. Forbes was driving, Octavia was in the passenger seat, and there were three juvenile girls in the backseat. There were no men in the car. During the stop, Forbes and Octavia

seemed nervous, gave conflicting answers when asked if they were traveling with anyone, and could not provide a rental agreement for the car. However, Forbes consented to a search of the car, and officers found over 3 kilograms of vacuum-sealed cocaine bricks and over 3,000 candy-like pills containing methamphetamine and caffeine. Some of the cocaine was found inside luggage with men's shoes, and a latent print found on one of the cocaine bricks matched Green's ring finger. Other latent prints were lifted from the black plastic bag containing the methamphetamine pills but were never identified.

The same day as the Louisiana traffic stop, agents searched Northpointe and Southbay. In the Northpointe house, police found (1) a utility and phone bill for the address in Green's name; (2) a designer men's belt and a receipt showing that it was purchased in Houston for $450 cash; (3) digital scales, one of which field-tested positive for cocaine, sandwich bags, and vacuum-sealing bags; (4) methamphetamine pills and tablets with cartoon-like markings that made them look like candy; and (5) a loaded firearm. One of the officers who performed the search explained that digital scales and plastic bags were used to weigh and separate large volumes of drugs for distribution. At Southbay, officers found (1) two driver's licenses with Green's name and picture bearing different addresses, (2) a debit or credit card and prescription medicine in Green's name, (3) a vacuum-sealing device, (4) a bag with white powder that field-tested as cocaine, (5) a bag of suspected marijuana, (6) size 12 men's shoes, which were consistent with Green's size, and (7) a loaded rifle and ammunition.

The government also offered testimony from Kendall Thompson, a federal prisoner serving a 14-year sentence for drug trafficking and firearm offenses. He explained that, on "two or three" occasions in 2018 and 2019, Green traveled to Houston to pick up "kilo sized" bricks of cocaine from him, and that a woman named Octavia would occasionally accompany him on these trips. However, Thompson conceded that his interactions with Green took place prior to the charged offenses and admitted that his testimony was inconsistent with what he had previously told law enforcement.

The defense's case consisted solely of Green's testimony. Green explained that he was a partner in a Pensacola club, and he traveled to Houston frequently to purchase items for this business, because it was cheaper and he had family in the area. As for the parcel containing the cocaine, Green conceded that he mailed the package to his mother and texted her updates about the delivery, but he maintained that he was mailing her clothes and supplies for his club, not illegal drugs. He explained that he listed the return address as his godsister Bianca Williams in the event the package was lost in transit, and he did not know her apartment number. Green also asserted that someone switched out the legal contents of his package with illegal drugs, and he denied having anything to do with the drugs found during the traffic stop. Indeed, Green maintained that there was no evidence that he possessed any cocaine or methamphetamine in this case.

Green further explained that Northpointe was his estranged wife Octavia's house, but they were "still cordial," so he would stay at the home and come over to visit her children. Octavia also put his name on her bills because she had delinquent payments from a previous address. As to Southbay, Green acknowledged that the house was originally rented for him by his mother, but he "was hardly there" so other members of his family used it.

At the close of the evidence, the district court denied Green's motion for a judgment of acquittal and allowed the case to be submitted to the jury. The jury found Green guilty of Counts One and Two, with the special findings that (1) Count One involved 5 or more kilograms of cocaine, 500 grams or more of methamphetamine mixture, and less than 50 but at least 5 grams of methamphetamine, and (2) Count Two involved the distribution of 500 grams or more of cocaine. However, because the jury failed to reach a verdict on Count Three, the district court declared a mistrial on that count and later permitted the government to dismiss the charge.

## C. *Sentencing*

Green's presentence investigation report ("PSI") provided a base offense level of 30 because Green was held responsible for 2,548.30 kilograms of converted drug weight. United States Sentencing Guidelines Manual § 2D1.1(a)(5), (c)(5) (Nov. 2021). The PSI also applied a two-level enhancement because Green possessed a firearm, *id.* § 2D1.1(b)(1), a four-level enhancement for Green's role as the "organizer or leader of [the] criminal activity,"

*id.* § 3B1.1(a), and a two-level obstruction-of-justice enhancement, *id.* § 3C1.1. Green's total offense level was 38. The PSI also placed Green in criminal history category V based on the ten criminal history points calculated. With a total offense level of 38 and a criminal history category of V, the PSI provided an advisory guideline range of 360 months to life. The PSI also noted that Green was subject to a mandatory minimum sentence of 25 years on Count One, 21 U.S.C. § 841(b)(1)(A)(ii), and 10 years for Count Two, 21 U.S.C. § 841(b)(1)(B)(ii).

Green filed several objections to the PSI, including challenges to (1) the converted drug weight calculation used for his base offense level, (2) the application of the leadership and firearm enhancements, and (3) the calculation of his criminal history score.

At sentencing, the district court sustained Green's objection to the four-level leadership enhancement, because there was not enough evidence that Green "exercised any control" over anyone in the conspiracy. The court overruled Green's remaining objections and recalculated his total offense level as 34, which with Green's same criminal history category, resulted in a guidelines range of 235 to 293 months. However, because of the applicable statutory minimums, Green's guideline term remained 300 months, or 25 years of imprisonment. Green's counsel requested the mandatory minimum sentence, asserting that, at 49 years old, 25 years of imprisonment would effectively be a life sentence for Green, and a longer sentence would not serve any additional deterrent value. Counsel further noted that Green took "full

responsibility" for his actions. Green also personally addressed the court and apologized to his family.

In announcing its sentence, the district court walked through the 18 U.S.C. § 3553(a) factors. It explained that it found this offense to be "very serious" because Green led a conspiracy that trafficked kilogram quantities of cocaine and methamphetamine across state lines for over a year. The court also noted that Green began this conduct just over a month after being acquitted of a federal firearm charge and while on bond for a state battery charge that was only dismissed because the victim refused to testify.

The court was "the most troubl[ed]" by Green's criminal history, as he had "engaged in a 30-year pattern of unabated violence, firearms, and narcotic-related conduct in [his] community." It noted that Green's history included property crimes, domestic violence, "incit[ing] a riot," and "most significantly . . . no less than four separate occasions where [he] picked up a gun and . . . shot at someone indiscriminately." The court further explained that Green had received a life sentence for attempted murder, but the conviction was reversed on a legal technicality, and it was concerned with the fact that Green went right back to crime rather than making the most of his "second chance."

The district court found that nothing had previously worked to deter Green, so it was "not convinced that any sentence [it] imposed" was going to work either. The court further highlighted that federal defendants in similar situations to Green had usually

endured significant hardships in their lives. However, the court found that Green "knew better" and was "exposed to better in [his] life," as he was raised in a loving home, had two successful sisters, and was headed toward success himself before making the "conscious decision . . . to choose a different path," which the court found to be "tragic and a waste." Finally, the court stated that because of "the few mitigating factors" present, including Green's substance abuse history, need for treatment, earning of his GED, and strong family support, it would not impose a life sentence. The court also explained that a mandatory minimum sentence was inappropriate, because Green's criminal history category significantly underrepresented "the seriousness and the violent nature of [his] criminal history."

Accordingly, the district court sentenced Green to 360 months of imprisonment and 10 years of supervised release. This appeal followed.

## II. STANDARD OF REVIEW

We review challenges to the denial of a motion to suppress under a mixed standard, reviewing the district court's fact-finding for clear error, "considering all the evidence in the light most favorable to the prevailing party," and the application of the law to those facts de novo. *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022) (en banc).

We review a challenge to the sufficiency of the evidence and the denial of a motion for a judgment of acquittal de novo, "examining the evidence in the light most favorable to the government

and resolving all reasonable inferences and credibility issues in favor of the jury's guilty verdicts." *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015) (citation modified).

We likewise review de novo the district court's legal interpretation of the guidelines and its application of the guidelines to the facts, *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014), but review the factual findings at sentencing for clear error, *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). When reviewing the reasonableness of a sentence, we consider the totality of the circumstances under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

## III. DISCUSSION

### A. *Green's Suppression Motion Was Correctly Denied*

The Fourth Amendment prohibits unreasonable searches and seizures and requires search warrants to be supported by probable cause. U.S. CONST. amend. IV. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment is generally inadmissible in a subsequent criminal prosecution. *United States v. Morales*, 987 F.3d 966, 972 (11th Cir. 2021). In this appeal, Green asserts three distinct challenges to the district court's denial of his suppression motion. We address each argument separately.

### 1. Ford Traffic Stop

First, Green challenges the district court's determination that he lacked a cognizable Fourth Amendment interest allowing him to challenge the stop and search of the Ford driven by Forbes.

Green possessed a cognizable Fourth Amendment interest to challenge this warrantless search only "if [he] had a 'legitimate expectation of privacy' in the [car] when it was searched." *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013). While he "need not own the car, his expectation of privacy must be reasonable, which means that it has a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* (citation modified); *see Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018).

In this case, Green did not own the car, no rental agreement was produced bearing Green's name, and he was not present in the vehicle when it was searched. Rather, he attempts to establish a cognizable Fourth Amendment interest by arguing that he had driven the car on prior occasions, he was traveling with the Ford, and his luggage was in the car.

None of these facts demonstrate that Green had a legitimate expectation of privacy in the Ford at the time of the traffic stop. *See Rakas v. Illinois*, 439 U.S. 128, 140, 148 (1978) (holding that passengers who did not own or lease a car and did not assert an interest in the seized property lacked a cognizable Fourth Amendment interest to object to the car's search); *Gibson*, 708 F.3d at 1277 (holding that a defendant who did not own a car but often drove it with the owner's consent had a cognizable Fourth Amendment interest to challenge a search of a borrowed car when it was in his possession, but not when he was neither the driver of, nor a passenger in,

it); *United States v. Miller*, 821 F.2d 546, 548–49, & n.2 (11th Cir. 1987) (holding that a person who borrows and drives a car with the owner's consent ordinarily has a legitimate expectation of privacy in the car and a cognizable Fourth Amendment interest to challenge its search *while it is in his possession*). Green's attempts to analogize his interest in the Ford to those of an overnight house guest are unavailing because a person's expectation of privacy in a car is "significantly different from the traditional expectation of privacy" in private dwellings, which are "ordinarily afforded the most stringent Fourth Amendment protections." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976); *see Rakas*, 439 U.S. at 148 ("We have on numerous occasions pointed out that cars are not to be treated identically with houses or apartments for Fourth Amendment purposes.").

We therefore find no error in the district court's determination that Green lacked the standing necessary to benefit from the exclusionary rule's protections with respect to the evidence obtained from the Ford. *See Rakas*, 439 U.S. at 134.

### 2. Residence Search Warrants

Green next argues that the warrants to search Northpointe and Southbay lacked probable cause because they did not establish the required nexus between those locations and the contraband sought. However, to warrant exclusion of the evidence obtained from these searches, Green "ha[s] to convince us that [all] of the district court's findings were incorrect." *United States v. King*, 751 F.3d 1268, 1277 (11th Cir. 2014).

In this case, the district court not only determined that the Northpointe and Southbay warrants were supported by probable cause, but also concluded that, even in the absence of probable cause, the officers relied on the warrants in good faith. However, Green does not make any challenge to the district court's good-faith determination in his initial brief. It is well established that "issues not raised in the initial brief on appeal are deemed abandoned." *Campbell*, 26 F.4th at 871. While Green briefly addresses this argument in his reply brief, we have long held that "an appellant in a criminal case may not raise an issue for the first time in a reply appellate brief." *United States v. Castillo*, 899 F.3d 1208, 1215 (11th Cir. 2018) (citation modified); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (explaining that an appellant also "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority"). As such, we conclude that Green failed to properly present any challenge to the district court's determination that the good-faith exception applied to the searches of Northpointe and Southbay, and he has "therefore abandoned an issue on which he had to prevail in order to obtain reversal." *King*, 751 F.3d at 1277.

"When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Id.* (citation modified). Accordingly, we need not address Green's challenges to the sufficiency of the Northpointe and Southbay warrants and

affirm the district court's decision to allow the admission of the evidence obtained from these searches.

### 3. Renewed Cell Phone Warrant

Finally, Green asserts that the district court erred in denying his request to suppress the evidence obtained from the renewed warrant to track his phone because it was not supported by probable cause.

The probable cause standard is "not a high bar" and does not require anything "even approaching conclusive proof or proof beyond a reasonable doubt." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (citation modified). Rather, probable cause is a "flexible, common-sense standard," *Florida v. Harris*, 568 U.S. 237, 240 (2013) (citation omitted), that only requires a "mere probability or substantial chance of criminal activity," *Delgado*, 981 F.3d at 897 (citation modified). Accordingly, "in considering probable cause, we do not isolate events, but consider the totality of the circumstances to decide whether there was a fair probability that contraband or evidence of a crime would be found in a particular place." *Id.*

Green maintains that the first phone warrant did not produce any information that police were not already aware of or connect him to any illegal activity, so the "stale" information from the initial warrant application could not be used to support the issuance of the renewed warrant. Green is correct that "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant

issues." *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). And, in this case, the renewed warrant application contained information that was used to support the application for the first phone warrant, including (1) the evidence that Green shipped cocaine to his mother, (2) the information of three informants about Green's drug shipping activity, and (3) Green's suspicious travel to and from Houston.

However, "[t]here is no particular rule or time limit for when information becomes stale," and we must decide staleness based on a case's "particular facts." *Id*. at 1265. Here, although the incident with the mailed package of cocaine occurred six months prior to the renewed warrant application, that evidence, coupled with the other information gathered during the investigation, suggested that Green was engaged in continuous drug trafficking. *See id*. (explaining that courts should consider, among other things, "the length of time and the nature of the suspected crime (discrete crimes or ongoing conspiracy)" in determining whether staleness is an issue). That older information was therefore relevant to establishing probable cause.

And, contrary to Green's assertion, the renewal application was supported by new evidence of his suspected involvement in criminal activity, including more information about Green's trips to Houston, phone calls he made to a known drug distributor, and the incident in which he knocked on the door of a hotel room where police were actively recovering drugs. Further, while Green takes issue with the officer's use of information supplied by

unreliable informants, the warrant application conceded that these informants had "un-tested reliability," but explained how independent police investigation recovered consistent information. *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." (citation modified)).

In sum, the evidence offered in support of the renewed phone warrant permits the "common-sense" conclusion that additional GPS tracking of Green's phone could have yielded further information about his involvement in illegal drug trafficking. *Harris*, 568 U.S. at 243; *see Delgado*, 981 F.3d at 897. We therefore find no error in the district court's decision to deny Green's suppression motion with respect to this evidence.

### B. *Sufficient Evidence Supports Green's Convictions*

Green asserts that the district court erred in denying his motion for a judgment of acquittal because insufficient evidence supported his convictions. We will uphold the district court's denial of this motion "if a reasonable trier of fact could conclude that the evidence established [Green's] guilt beyond a reasonable doubt." *United States v. Holmes*, 814 F.3d 1246, 1250 (11th Cir. 2016) (citation omitted). Our "test for sufficiency of the evidence is identical regardless of whether the evidence is direct or circumstantial." *United States v. Beach*, 80 F.4th 1245, 1256 (11th Cir. 2023).

We begin with Count Two, which charged Green with distributing, or aiding and abetting in the distribution of, the cocaine

mailed to his mother in July 2021. To sustain a conviction on this count, the government was required to prove that Green knowingly distributed a drug and that he knew that this drug was a controlled substance. *McFadden v. United States*, 576 U.S. 186, 191–92 (2015). To prove Green's guilt under a theory of aiding and abetting, the government was required to show that: "(1) the substantive offense was committed by someone; (2) [Green] committed an act which contributed to and furthered the offense; and (3) [Green] intended to aid in its commission." *United States v. Tagg*, 572 F.3d 1320, 1324 (11th Cir. 2009) (citation omitted).

Green maintains that the government failed to meet its burden on Count Two because there was no evidence that he knew the package contained cocaine. He notes that he did not drop off the package at the post office, the cocaine was not wrapped in the exact materials he purchased from Office Depot, and neither his fingerprints nor DNA were found on or in the parcel. We are unpersuaded by these arguments.

The government presented evidence that Green purchased shipping supplies from Office Depot with his girlfriend just one day before she mailed a package that contained over five pounds of cocaine. While Green points to facts suggesting that the parcel could have been tampered with in transit, the government's evidence was not required to "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997) (citation modified). And it is undisputed that the most unique

item Green purchased, a "Vaultz" lockbox, was the same container where the cocaine was found.

The jury also heard testimony that Green sent his mother the tracking information for this package and was insistent that she pick up the parcel for him as quickly as possible. While we recognize that this evidence is circumstantial, we find that a reasonable juror could conclude that Green directed his girlfriend to mail a distribution amount of cocaine on his behalf. *See Tagg*, 572 F.3d at 1324; *United States v. Poole*, 878 F.2d 1389, 1391–92 (11th Cir. 1989) (noting that all three elements of a § 841(a)(1) offense can be proven by circumstantial evidence).

We turn next to the drug distribution conspiracy charged in Count One, which required the government to prove beyond a reasonable doubt that "(1) there was an agreement between two or more people to violate [21 U.S.C.] § 841(a)(1); (2) [Green] knew about the agreement; and (3) [Green] voluntarily joined the agreement." *United States v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021). Green argues that the government failed to establish that any of the women in his life knew they were playing a role in distributing cocaine or that they knowingly agreed to do so. He further asserts that there was no evidence tying him or any alleged co-conspirators to the evidence found in the residences or in the Ford. We disagree.

In addition to the evidence outlined above regarding the mailed package of cocaine, the jury heard evidence that Green regularly made short trips from Pensacola to Houston, a known "source city" for illegal drugs. During one of these trips, Green was

traveling with Octavia and Forbes, who both acted nervous when pulled over by police. When officers searched the car, they found distribution quantities of cocaine and methamphetamine pills. Men's shoes were found in the luggage with the cocaine, despite the absence of men in the car, and one of Green's fingerprints was found on the cocaine's packaging. Also, the candy-like methamphetamine pills found in the car matched those found at Octavia's Northpointe home, where Green admitted to having stayed. Similarly, the government presented evidence that Green's personal belongings were found at Southbay, a home rented for him, along with a vacuum-sealing device and cocaine. While this evidence is circumstantial, taken together, it supports a finding that two or more people agreed to commit a drug-related offense, Green knew of the conspiracy, and he agreed to partake in it. *See Colston*, 4 F.4th at 1187; *United States v. Carrascal-Olivera*, 755 F.2d 1446, 1450 (11th Cir. 1985).

In any event, "we have no need to decide finally whether the government's evidence alone was enough to prove guilt," because Green chose to testify in his own defense and therefore "r[an] [the] substantial risk of bolstering the [g]overnment's case." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). Green attempted to rebut the government's evidence by testifying, in relevant part, that (1) he went to Houston to acquire supplies for his club and visit family, (2) someone swapped the package of clothes he sent to his mother for several thousand dollars' worth of cocaine, and (3) he had nothing to do with the drugs found in the car he was traveling with or the homes where he stayed.

As the trier of fact, the jury was entitled to disbelieve the entirety of this testimony, conclude the opposite was true, and consider that substantive evidence of Green's guilt, given the implausibility of many of his claims and the fact that the government challenged his credibility on cross-examination. *See id.* ("[T]he jury, hearing [the defendant's] words and seeing his *demeanor*, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said." (emphasis in original)).

The only question for our Court is "whether reasonable minds *could* have found guilt beyond a reasonable doubt, not whether reasonable minds *must* have found guilt beyond a reasonable doubt." *United States v. Ellisor*, 522 F.3d 1255, 1271 (11th Cir. 2008) (emphasis in original). And, based on the evidence in this case, we conclude that a reasonable jury could find—as this jury did—that it was not merely coincidental that Green found himself associated with distribution quantities of illegal drugs on multiple occasions. *See Beach*, 80 F.4th at 1255 ("We will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt." (citation modified)); *United States v. Broughton*, 689 F.3d 1260, 1277 (11th Cir. 2012) ("We are bound by the jury's credibility choices, and by its rejection of the inferences raised by the defendant." (citation modified)). As such, the district court did not err in denying Green's motion for a judgment of acquittal.

C. *Green's Sentence Is Procedurally and Substantively Reasonable*

In assessing the reasonableness of a sentence, we "must first ensure that the district court committed no significant procedural error," including "failing to calculate (or improperly calculating) the Guidelines range." *Gall*, 552 U.S. at 51. On appeal, Green makes several challenges to the district court's calculation of his guideline range. However, we need not consider these arguments because, even if Green is correct that the district court erred in calculating either his offense level or criminal history score, any such error was harmless, as it "did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992); *see* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

As the district court recognized, Green's calculated guideline range of 235 to 293 months fell below the applicable statutory minimum, so "the statutorily required [300 month] minimum sentence [became] the guideline [term]." U.S.S.G. § 5G1.1(b). And, as Green conceded before the district court, even if all of his guideline objections were resolved in his favor, resulting in a further reduced guideline range, his 300-month mandatory minimum "would take precedence." We are therefore satisfied that any procedural error committed by the district court in calculating Green's guideline range was harmless. *See United States v. Lebowitz*, 676 F.3d 1000, 1016 (11th Cir. 2012); *United States v. Sarras*, 575 F.3d 1191, 1220 n.39 (11th Cir. 2009).

We now turn our focus to the substantive reasonableness of Green's sentence. Section § 3553(a)'s "overarching" instruction to courts is that any sentence must be sufficient, but not greater than necessary, to comply with the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see Gall*, 552 U.S. at 51. These sentencing purposes include the need to reflect the seriousness of the offense, promote respect for the law, sufficiently punish the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2). A court must also consider the offense's nature and circumstances, the defendant's history and characteristics, the types of sentences available, the applicable guideline range, any pertinent policy statements from the Sentencing Commission, the need to avoid unwarranted sentencing disparities between similarly situated defendants, and the need to provide restitution to any of the defendant's victims. *Id*. § 3553(a)(1), (3)–(7).

Green maintains that he should have been sentenced to the 25-year mandatory minimum, and, in imposing an upward variance, the district court overemphasized his criminal history, which was already accounted for in his guideline range, and overlooked many mitigating factors, including his age, acceptance of responsibility, and potential for rehabilitation. We disagree.

Even though Green's calculated guideline range incorporated his criminal history, the district court was within its discretion to find that this range did not account for the nature of his prior offenses or his pattern of continuous criminal behavior. *See United*

*States v. Rosales-Bruno*, 789 F.3d 1249, 1263–64 (11th Cir. 2015); *United States v. Tome*, 611 F.3d 1371, 1379 (11th Cir. 2010) (A "district court [is] free to consider any information relevant to [the defendant's] 'background, character, and conduct' in imposing an upward variance." (quoting 18 U.S.C. § 3661)).

The weight given to each § 3553(a) factor is left to the discretion of the district judge, and, as such, the court was permitted to give substantial weight to Green's extensive history of violent criminal activity over other factors discussed at sentencing. *Rosales-Bruno*, 789 F.3d at 1255, 1259–60, 1263–64; *see United States v. Osorio-Moreno*, 814 F.3d 1282, 1287–88 (11th Cir. 2016). Also, the record demonstrates that the district court carefully considered the relevant 18 U.S.C. § 3553(a) factors and chose not to impose a life sentence because of Green's family support and need for substance abuse treatment. The court's failure to address every mitigating argument Green offered does not mean that the court "erroneously 'ignored' or failed to consider this evidence." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007).

Additionally, Green's 360-month total sentence is below the applicable statutory maximum sentences of life imprisonment on Count One and 40 years on Count Two, which is further indicative of reasonableness. 21 U.S.C. § 841(b)(1)(A)(ii), (b)(1)(B)(ii); *see United States v. Muho*, 978 F.3d 1212, 1227 (11th Cir. 2020) ("[S]entences that fall . . . below the statutory maximum are generally reasonable.").

We will vacate a sentence only when "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (citation modified). We are not left with such a conviction in this case and find that the district court did not abuse its discretion in imposing Green's 360-month sentence.

## IV. CONCLUSION

We **AFFIRM** Green's convictions and sentence.